22 U.S. 581 (1824)
9 Wheat. 581
RENNER, Plaintiff in Error,
v.
The PRESIDENT, DIRECTORS, AND COMPANY OF THE BANK OF COLUMBIA, Defendants in Error.
Supreme Court of United States.
February 24, 1824.
March 5, 1824.
*582 This cause was argued by Mr. Webster and Mr. Jones,[a] for the plaintiff in error, and by Mr. Key,[b] for the defendants in error.
Mr. Justice THOMPSON delivered the opinion of the Court.
This case comes up on a writ of error to the Circuit Court of the District of Columbia; and by the record it appears, that the action in the Court below was prosecuted against Renner, the plaintiff in error, as endorser of a promissory note, drawn by James Foyles, and discounted at the Bank of Columbia. The note bears date on the 9th day of January, 1817, for 4600 dollars, *583 and is payable sixty days after date. In the declaration it is averred, that demand of payment of the maker was made on the 14th of March, which was on the fourth day after the expiration of the sixty days, which the note had to run.
Several questions, arising out of the record, have been presented for the consideration of the Court. The principal one, however, is that which relates to the time of demand of payment of the maker of the note, and grows out of a bill of exceptions taken upon the trial. This has been pressed upon the Court as a question of great importance, and the decision of which, in its application to the concerns of the Bank, will have a very wide and extensive effect.
We shall proceed to the consideration of this point, in the first place, leaving the others, which are of minor importance, to be noticed hereafter.
The testimony given at the trial was for the purpose of showing that the Bank of Columbia had, from its first establishment, in 1793, adopted the practice of demanding the payment of notes discounted by it, on the fourth day after the time limited for the payment thereof, according to the express terms of the note. And that such was the universal custom of all the banks in Washington and Georgetown. That this custom was well known and understood by the defendant, when he endorsed the note in question. After this testimony had been received, without objection, the counsel for the defendant below called upon the Court to instruct the jury, that upon the evidence so given by the plaintiffs, of a demand upon the *584 maker of the note, on the fourth day after the time limited by the note for the payment, the defendant was not liable on his endorsement; which instruction the Court refused give, and a bill of exceptions was thereupon taken.
This Court must, therefore, assume as established facts, (and, looking at the evidence before the jury, no doubt could be entertained on the subject,) that the custom of the Bank of Columbia, and all the other Banks in Washington and Georgetown, from their first institution, had been, to demand payment of notes due them, on the fourth day after the time limited therein; and that this custom was known and well understood by the defendant, Renner, when he endorsed the note in question: and it may be added, with full knowledge and expectation, that this note was to be dealt with in the same way; for it was a renewal of a discount, continued for a considerable time before, on other notes similarly drawn and endorsed, some of which had been demanded in like manner, and protested, and afterwards paid and taken up by himself. Under such circumstances, it would seem, that nothing short of some positive and unbending principle of law, could shield the defendant from responsibility. But, so far from trenching upon any such principle, we think his liability completely established, by well settled rules of law.
It seems to be assumed as the settled law of promissory notes, that in order to charge an endorser, demand of the maker must be made on the third day after that limited in the note; and that *585 this is so stubborn a rule, that parties are not permitted to violate it, even by their mutual agreement.
We admit, in the most unqualified manner, that the usage of making the demand on the third day of grace, has become so general, that Courts of justice will notice it ex officio; and in the absence of any proof to the contrary, will presume that such was the understanding of all parties to a note, when they put their names upon it. But that this rule has any attributes so inviolable, as not to be touched by the parties to negotiable paper, cannot be admitted. It has its origin in custom, and that custom, too, comparatively, of recent date; and is not one of those, to the contrary of which the memory of man runneth not, and which contributed to make up the common law code, which is so justly venerated. So far from this, that the allowance of any days of grace, is in derogation of the common law rule, applicable to other contracts. They are, emphatically, the mere creatures of usage, varying in different countries, to suit the views and convenience of men in business, originally gratuitous, and not binding on the holder. The common law would require payment on the last day limited by the contract, and would also give to the maker the whole of that day. It is a settled principle of the common law, applicable to all contracts, that a party has until the last day limited by his agreement, to perform his engagement, and even until the last hour of the day. The common law knows of no fractions of a day; custom, however, and that introduced, too, principally by banks, has limited *586 the day to a few hours of business. But this, and whatever other rules have been adopted by consent, and merely for the convenience of commercial men, are departures from the common law doctrine. When, therefore, the allowance of only three days of grace, is said to be the law of the contract, by bills of exchange and promissory notes, nothing more can be intended, than that custom has so long sanctioned this rule, that all dealers in paper of this description, are understood to govern themselves by it. The law of the contract, properly speaking, is to pay when due; and that time is to be ascertained, either from the contract per se, or that taken in connexion with some known custom, which the parties are presumed to have tacitly consented, should be made a part of the contract. And it is in this view only, that three days of grace are allowed, where that custom is recognized as the rule; for a note, which upon its face has sixty days to run, is in truth and in fact, a contract for sixty-three days, and interest is taken for that time. And how is it ascertained that it is a note for sixty-three days, but by looking out of the contract, and finding what was the understanding of the parties? Where the custom has existed for a long time, and has become general, Courts of justice, as before observed, will notice it ex officio; and where it has not, it is matter of proof. If this is not the light in which these transactions are to be considered, all banks are chargeable with usury; for all take interest beyond what is allowed by law, if time is to be determined by the note itself. The general rule of law is, *587 that demand of payment must be made of the maker, when the note falls due; and that time, as now settled, is on the last day of grace; and even this rule is of recent date, for in the King's Bench in England, as late as the year 1791, about coeval with the institution of this bank, and the custom established by it, we find (Leftly v. Mills, 3 T.R.) Lord Kenyon and Mr. Justice Buller differing on this very point: the former holding that, by analogy to other contracts, the acceptor of a bill of exchange had the whole of the third day of grace to pay the bill, and that a demand on the fourth day was not too late. Mr. Justice Buller thought the demand ought to be made on the third day of grace; that the nature of the acceptor's undertaking, was to pay the bill on demand, on any part of the third day of grace; and he inferred this, from its having been, as he said, the practice to make the demand on that day. If it was a doubtful question in England, so late as the year 1791, whether the demand ought to be made on the third day of grace, or the day after, this bank is not chargeable with any culpable innovation upon long established rules of law or usage, by adopting the practice of making the demand on the fourth day.
It is said, however, that the effect of this testimony is, to alter and vary, by parol evidence, the written contract of the parties. If this is the light in which it is to be considered, there can be no doubt that it ought to be laid entirely out of view; for there is no rule of law better settled, or more salutary in its application to contracts, than that *588 which precludes the admission of parol evidence, to contradict or substantially vary the legal import of a written agreement. Evidence of usage or custom is, however, never considered of this character; but is received for the purpose of ascertaining the sense and understanding of parties by their contracts, which are made with reference to such usage or custom; for the custom, then, becomes a part of the contract, and may not improperly be considered the law of the contract; and it rests upon the same principle as the doctrine of the lex loci. All contracts are to be governed by the law of the place where they are to be performed; and this law may be, and usually is, proved as matter of fact. The rule is adopted, for the purpose of carrying into effect the intention and understanding of the parties. That the note in question was to be paid at the Bank of Columbia, and to be governed by the regulations and custom of the institution, and so understood by all parties, cannot admit of a doubt.
It would be a waste of time, to go very much at large into an examination of the various usages and customs, that are admitted in evidence and recognised in Courts of justice, both in England and in this country, in almost every branch of business, and especially in commercial transactions, for the purpose of ascertaining the meaning and interpretation of contracts. A few only will be noticed, that are somewhat analogous to the present case.
In the case of Cutler v. Powell, (6 T.R. 320.) where was brought under consideration the legal effect of a promissory note, given to the mate of a *589 ship for a certain sum of money, provided he proceeded on her voyage, and continued to do duty to the port of destination. The legal construction to be given to this note was clear, and so considered by the Court, that nothing was due, unless the mate continued to do duty to the port of destination. He having died, however, on the voyage, the Court directed an inquiry into the usage of merchants in such cases, declaring that if it sanctioned an allowance for the time the service was performed, the plaintiff should recover according to such usage.
No intimation is here given, that such proof would be repugnant to the contract, although it was against the legal import of the note, if construed without reference to the usage; and although the usage related to trade, it was very limited in its application.
So in Noble v. Kenneway, (Doug. 511.) usage of trade was admitted in evidence, to explain the understanding of parties, in a policy of insurance, although the usage had not existed three years. Lord Mansfield said, the usage could only be known by proof, and must be tried by a jury; that underwriters must be presumed to be acquainted with the practice of the trade they insure, whether recently established or not. If it were necessary, cases might be multiplied almost without end, showing the same principle and same recognition of local and particular usages, in almost every branch of business.
We have, also, in the State Courts in our own country, the decisions of very enlightened Judges, adopting the same principles, and governing themselves *590 by the same rules; and in many cases, not unlike the one before us.
In Jones v. Fales, (4 Mass. Rep. 252.) the same doctrine as to usages of banks, was fully sanctioned; and although that particular usage might have been found, in practice, inconvenient, and not to meet public approbation, yet the principle which governed the decision of the Court, is not thereby weakened, viz. that the usage with which the defendant was conversant, was proper evidence to be submitted to a jury, to infer from it the agreement of the party. And although, as suggested at the bar, this custom was altered by the banks, we do not find the Courts of justice in that State attempting to control it, in its application to notes made in reference to the usage.
The doctrine of this case was again fully recognised in The Lincoln and Kennebeck Bank v. Page, (9 Mass. Rep. 155.) where it was held, that bank usages, established respecting demands on makers of promissory notes, and notices to endorsers, being known to dealers in the banks, they were bound by them, and that the usage was proper evidence to be submitted to a jury. These cases are not referred to for the purpose of approving the particular usages, but to show that evidence of such usage was never considered as contradicting the written contract.
Halsey v. Brown and others, (3 Day, 346.) is a very strong case on this subject. The question was as to the liability of ship owners, for the loss of money taken on freight by the captain. The defence set up was, that the master, according to *591 established custom, was permitted to take money on freight, as a perquisite to himself, and the owners discharged from responsibility; and the question directly presented to the Court was, whether a particular custom or usage could be given in evidence, to control the general law. And the Court says, it is a principle, that the general common law may be, and in many instances is, controlled by special custom. So the general commercial law may, by the same reason, be controlled by a special local usage, so far as that usage extends, which will operate upon all contracts of this nature, made in view of, or with reference to, such usage.
In Smith v. Wright, (1 Caines, 43.) this general principle is laid down: The true test of a commercial usage is, its having existed long enough to have become generally known, and to warrant a presumption that contracts are made in reference to it.
In the case of The Bank of Utica v. Smith, (18 Johns. Rep. 230.) a note, payable at the Mechanics' Bank in New-York, was presented, and payment demanded, fifteen minutes after bank hours, and this was held sufficient; it appearing, that although it was a quarter of an hour after the usual time of closing the bank as to other business, it was within bank hours, it appearing that, according to the general course of doing business at this bank, these fifteen minutes were the usual and accustomed time for these presentments, and of this course of business the defendant ought to have informed himself.
*592 It is unnecessary to pursue this subject farther by particular reference to decisions in the State Courts. The same doctrine, as to the effect of particular usages in controlling the general law, will be found to accompany the administration of justice, wherever the subject is brought under consideration. Whether these usages are, in all instances, wise and beneficial, may, perhaps, be questionable, but where they do exist, they are considered as regulating and controlling contracts, made under and in reference thereto.
The same principle is recognised by this Court, in the case of Yeaton v. The Bank of Alexandria, (5 Cranch, 492.) The Chief Justice, in speaking of the effect of usage upon the legal obligation of parties, observes, if the case showed that such was the usage of the bank, and such the understanding under which notes were discounted, this Court is not prepared to say, that the undertaking created by the endorsement, would not be so fashioned as to give effect to the real intention of the parties.
These cases are sufficient to show, in the most satisfactory manner, the light in which Courts of justice consider contracts, made in reference to any particular usage, and the effect that such usage is to have upon them. And no good reason is perceived why these principles should not be applied to the case before us. The custom, under which this bank has transacted business for five and twenty years, of demanding payment of the drawers of notes on the fourth instead of the third day, after the time limited for payment, is *593 not unreasonable or repugnant to any principles of general policy. It does not stand alone, but is in accordance with the usage of every other bank in Washington and Georgetown. The defendant endorsed the note in question, with full knowledge of the custom. A demand on the fourth day is in perfect harmony with the principles of the common law, if applied to the contract, the maker having the whole of the third day to pay his note, and not being in default until the fourth. The inconveniences suggested on the argument growing out of a usage here, differing from that which is in practice in other places on this subject, are not of great public concern. If they exist, they affect the banks and their customers only. And if felt to the prejudice of either the one or the other, we may rest assured it would be altered. Their private interest is a sure guaranty for this.
But, admitting the practice to be inconvenient, and that a uniformity, in this respect, with other parts of the country would be desirable, the remedy is not in the hands of Courts of justice, whose business it is to judge of contracts as made by parties themselves, and not to prescribe the manner in which they shall be made.
We are, accordingly, of opinion that the Court below did not err in refusing to instruct the jury that the demand upon the maker of the note, on the fourth day after the time limited for payment thereof, discharged the defendant from liability on his endorsement.
One of the minor points, which has been alleged as error, appearing on the face of the record, *594 is, that the demand on the maker of the note should, at all events, have been laid on the third day after the time limited by the note for payment, and not on the fourth. This objection cannot be sustained at this time. Whether the declaration would not have been bad on demurrer, not, however, because the demand is laid on a wrong day, but because it does not aver the usage, is a question not necessary now to decide. But if, as we have determined, the demand was properly made on the fourth day, it would have been bad if laid at an earlier day, because the maker would have been under no obligation to pay, and, of course, not in default. If, therefore, the cause should be sent back to the Court below, no amendment in this respect ought to be made. The want of an averment, so as to let in the proof of usage, cannot now be objected to the record. The evidence was admitted without objection, and now forms a part of the record, as contained in the bill of exceptions. Had an objection been made to the admission of the evidence of usage, for the want of a proper averment in the declaration, and the evidence had, notwithstanding, been received, it would have presented a very different question.
The time of the demand, as laid in the declaration, is according to the legal effect of the note. If made at an earlier day, it would have given no cause of action against the endorser, for he was not bound to pay until the default of the maker, and he was not in default until the fourth day. *595 It is a general rule, in declaring as to time, that it must be laid after the cause of action accrues.
The case of Rushton v. Aspinwall, (Doug. 679.) does not apply. The bill of exchange, upon which that suit was founded, was dated on the 27th of November, in the year 1778, payable three months after date. The declaration stated, that the bill was presented for acceptance on the day of the date thereof, and duly accepted, and, afterwards, on the same day, the acceptor was requested to pay, &c. but neglected and refused, &c., and then goes on to state the liability of the defendant, as endorser, and that he, on the same day, assumed and promised to pay, &c. It appears, therefore, that the refusal of the acceptor, and the assumption of the endorser, are laid on the day of the date of the note, which was three months before it fell due. The plaintiff, therefore, by his own showing, had no cause of action when he commenced his suit. This was a defect which no verdict could cure. He had not set forth his cause of action defectively, but shown that he had no cause of action; and this was the ground on which it was placed by the Court. A cause of action, defectively or inaccurately set forth, is cured by the verdict, because, to entitle the plaintiff to recover, all circumstances necessary in form or in substance, to make out his cause of action, so imperfectly stated, must be proved at the trial; but when no cause of action is stated, none can be presumed to have been proved.
This case is not to be considered as if before *596 us on demurrer to the declaration. There being no averment of the special custom as to the demand on the fourth day, and the general rule being that the demand must be made on the third, if the declaration alleges it to have been made on the fourth, the joinder in demurrer admits the fact, and, of course, that the demand was too late. But had the declaration contained an averment of the special custom, it must allege a demand on the fourth day. That is according to the legal effect of the note; and a demand laid on any other day would have been bad. We must now consider the case as if the declaration had contained a special averment of the custom, the proof having been before the Court and jury without objection, and now making a part of this record.
The only remaining question arises out of a bill of exceptions, taken upon the trial, to the decision of the Court below, admitting secondary evidence of the contents of the note. And it has been contended,
1st. That no such evidence was admissible. unless it appeared that the note was destroyed.
The rule with respect to the admission of secondary evidence, we think, is not so restricted. If the original is lost, by accident, and no fault is imputable to the party, it is sufficient. In the present case, it appeared that the note was in Court a few days before, and introduced in evidence on the trial against Foyles, the maker, but had been mislaid, and upon thorough search could not be found. Every case of this kind must depend, in a great measure, upon its own circumstances. *597 This rule of evidence must be so applied as to promote the ends of justice, and guard against fraud or imposition. If the circumstances will justify a well grounded belief, that the original paper is kept back by design, no secondary evidence ought to be admitted; but when no such suspicion attaches, and the paper is of that description, that no doubt can arise as to the proof of its contents, there can be no danger in admitting the secondary evidence. In this case, the note having been in Court a few days before, and proved, upon a trial against the maker, there could be no possible inducement to withhold it, and it was, no doubt, mislaid purely by accident.
It is objected, in the second place, that if secondary evidence is admissible, the contents of the note was not proved by that which was competent; that it should have been by a notarial copy. Proof of the contents of a lost paper ought to be the best the party has in his power to produce, and, at all events, such as to leave no reasonable doubt as to the substantial parts of the paper. But, to have required a notarial copy, would have been demanding that, of the existence of which there was no evidence, and which the law will not presume was in the power of the party; it not being necessary that a promissory note should be protested.
It is objected, lastly, that secondary evidence was not admissible, without a special count in the declaration upon a lost note. The English practice on this subject has not been adopted in this country, as far as our knowledge of it extends, *598 and to require a special count upon a lost note, would be shutting the door against secondary evidence, in all cases where the note was lost after declaration filed. We do not think any danger of fraud is to be apprehended from the admission of such evidence, under the usual count upon the note; and, the practice in the Court below not requiring a special count in such cases, no error was committed in the admission of the evidence.
Judgment affirmed.[a]
NOTES
[a] They cited Rushton v. Aspinwall, Doug. 679. Chitty on Bills, 62. 465. Bayley on Bills, 185, 186. 7 East's Rep. 231. Lyndo v. Burgos, Per Sir W. Grant, 1 Wheat. Selw. N.P. 280. Heylin v. Adamson, 2 Burr, 678. Thompson v. Ketchum, 8 Johns. Rep. 189. Hoare v. Graham, 3 Cowp. 57. 1 Phillips on Evid. 432, 433. 496. 498. Lewis v. Thatcher, 15 Mass. Rep. 431. Edie v. E.I. Company, 2 Burr, 1216. Davis v. Todd, 4 Taunt. 672.
[b] He cited 4 T.R. 153. 173. 2 Caines' Err. 196. 2 Caines' Rep. 443. 1 Caines' Rep. 43. 18 Johns. Rep. 230. 12 Johns. Rep. 423. 13 Johns. Rep. 470. 1 Phillips on Evid. 490. 492. 1 Harris & Johns. 423. 4 Mass. Rep. 251. 6 Mass. Rep. 449. 477. 9 Mass. Rep. 155. 159. 10 Mass. Rep. 26, 366. 12 Mass. Rep. 89. 3 Dall. Rep. 365. 415. 5 Cranch, 49. 9 Cranch, 1.
[a] Mr. Chief Justice MARSHALL, Mr. Justice WASHINGTON, and Mr. Justice DUVALL, did not sit in this cause. Mr. Justice STORY dissented.