SAMPSON AND LINDSAY *VS* GAZZAM.

1. In all cases where a custom or usage has been engrafted on our system of jurisprudence, so as to become a part of the unwritten law, there must have been a time, when it began to be, at which time, as the courts could not take judicial notice of it, the custom must have been proved, not as law, but as evidence of the intention of parties. Therefore—

2. The custom of merchants and others in Alabama, is recognised as a part of the law, when it is offered to prove what was the intention of parties to a contract; although, *semble*, such custom may be afterwards ripened into law.

3. Where a custom or usage is proved to exist, in relation to a particular trade or pursuit, if it be general, all persons engaged therein, are presumed to contract, in reference to such usage.

4. Evidence of usage or custom is received for the purpose of ascertaining the sense and understanding of parties by their contracts, which are made with reference to such usage or custom. The custom becomes part of the contract, and may be considered the law of the contract, and rests on the same principles as the doctrine of the *lex loci.*

5. If, by the usage or practice of one class of the community,

words are used in a different sense from their acceptation a-mong others, not engaged in the same pursuit, their language ought not to be interpreted by a rule not within their contemplation, at the time of making the contract: Therefore,

6. Parol proof may be received, to shew that the words "dangers of the river," in a bill of lading, are, by the usage and custom of merchants and others, understood to include other casualties than those arising from the element of water.

Error to the Circuit court of Mobile.

Action on the case against defendant, as a common carrier. At the Spring term of the said court, eighteen hundred and thirty-two, plaintiffs declared against defendant, for that, whereas said defendant, on a certain day, theretofore, was the owner of a steam boat, generally known and called as the Mobile, then and at that time, running and navigating the Alabama river, for the transportation of passengers, goods, wares and merchandize, cotton, and other articles of freight, on the said boat, and receiving reasonable hire or compensation therefor, did, on the day and year mentioned, accept and receive from the plaintiffs, at Claiborne, to, wit, in the county aforesaid, divers goods and chattels, the property of said plaintiffs, to wit, twenty-seven bales of cotton, of great value, &c.—which said cotton, at the time of the delivery thereof, to defendants, by plaintiffs, was in good order and well conditioned, and which defendant, then and there at the day mentioned, and in the county aforesaid undertook and faithfully promised to deliver in the like good order and condition, to Messrs St. John & Leavens, or their assigns, at the port of Mobile, at the rate of one dollar per bale, freight, for the transportation and delivery of the same, at the said port of Mobile. Yet said defendant, not regarding his duty, &c., never did deliver the said twenty-seven bales of cotton, at Mobile,

aforesaid—but so to do, had entirely failed, in so much that the said twenty-seven bales of cotton, had been entirely lost to plaintiffs, &c.

And whereas, also, to wit, on another certain day mentioned, in the said county, said defendant was engaged and employed as a common carrier, and as such, in the habit of carrying cotton from Claiborne to Mobile, to wit, in the county aforesaid, by means of a certain other steam-boat, called the Mobile, then and there belonging to defendant, and in the habit of receiving compensation therefor, said plaintiffs did, on the day mentioned, deposit on board said steam-boat, Mobile, certain other twenty-seven bales of cotton, in good order and well conditioned, for the purpose of having the same conveyed to the port of Mobile, in said like good order and condition, and then and there promised to pay the defendant for the transportation and delivery of said cotton, at Mobile, so much as he reasonably deserved to have. And defendant, then and there, to wit, at the county aforesaid, and on the day and in the year aforesaid, undertook, and faithfully promised said plaintiffs to deliver said twenty-seven bales of cotton to Messrs St. John & Leavens, or their assigns, at Mobile. Yet said defendant, not regarding his promise, and undertaking, &c., never did deliver the said cotton or any part thereof, to said St. John & Leavens, or to any other person—but plaintiffs averred, that the same had been utterly and entirely lost, to their damage, &c.

To this declaration defendant plead the general issue, and at the Spring term of eighteen hundred and thirty-four, in the same court, came a jury of good and lawful men, who being sworn, &c. said they found a verdict in favor of the defendant. It was therefore, considered, by the court, that plaintiffs take nothing in their writ, and that defendant should go thence, without day, and recover his costs, &c., for which execution might issue, &c.

Plaintiffs thereupon filed their bill of exceptions, which stated that the bill of lading was in the following words and figures :

" Shipped, in good order and well conditioned, by Sampson and Lindsay, on board of the steam-boat called the Mobile, whereof Young was master, then lying at Claiborne, and bound for Mobile, twenty-seven bales of cotton, marked and numbered as on the margin, and to be delivered in the like good order and condition, at Mobile, (the dangers of the river only excepted,) unto St. John & Leavens, or their assigns, he or they paying freight for the said cotton, at one dollar,—primage and average accustomed. In witness whereof, the master or purser of the said vessel had affirmed to three bills of lading of that tenor and date, one of which being accomplished, the others to stand void," &c.

It was admitted that defendant was the owner of the boat, at the time the cotton was put on board, and that the officer who signed the bill was clerk on board, and that the boat, togethor with the twenty-seven bales of cotton, with the rest of the cargo, were entirely destroyed by fire, the night after the cotton was put on board, and before the boat reached Mobile; but in what manner the fire originated did not appear.

The plaintiffs proved the probable weight and value of the cotton, and closed the evidence on their part. The defendant proved that the fire originated in the hold of the boat,—That the hold was entirely filled with cotton, at Montgomery, and the hatches then closed two days before the fire occurred.—That the hatches were closed at Montgomery, and had not been opened for two days previous to the fire, and that no light or fire had been introduced into the hold. That the fire was seen bursting up perpendicularly through the deck, from the hold, and that the flame then had the size and appearance of the flame of a can-

dle ; that it burst out thus, about four feet behind the ash-pans and furnaces ; and that the space between the place where the fire burst out, and the ash-pans and furnaces, was sheathed with copper.

The witnesses further swore, that the fire could not, in their opinion, have been communicated from the ash-pans or furnaces. They also swore that the cotton placed in the hold, at Montgomery, was taken in during a rain, and that the officers and crew did every thing in their power, for the purpose of arresting the progress of the fire, and saving the boat and cargo ; and that the captain, officers and crew were sober, attentive and careful.

The defendant then offered numerous witnesses, for the purpose of proving what, according to the general sense, practice, and understanding of merchants, planters and others, in the State of Alabama, was the meaning of the words inserted in the bill of lading, viz: "dangers of the river only excepted," when such bill of lading was given for goods, shipped on board of a steam boat, to which the plaintiffs objected, on the ground, that the meaning of these words was ascertained by law, to be the dangers incident to the element of water, as storms, tempests, lightning, &c. and that an accidental fire did not fall within the meaning of the dangers of the river.

The objection was overruled by the court, and the defendant was permitted to prove whether an acidental fire, by which the boat and cargo were destroyed, and which was not attributed to any want of diligence, care, skill or integrity, on the part of those entrusted with the control and management of the boat, and which they could not have prevented, did, according to the general sense, practice and understanding of the people of the State of Alabama, including merchants, planters, boat-owners and others, fall within the meaning of the exception of the bill of lading, to wit, "the dangers of the river."

The plaintiffs requested the court to charge the jury, that steam-boat owners were, in legal contemplation, common carriers, and were liable as such, for the delivery of all articles shipped on board of their boats, unless they were disabled from making such delivery, by the act of God, a public enemy, or some other cause naturally arising out of the element of water, and that the accidental destruction of the boat, by fire, was not within the meaning of the exception, to-wit, "the dangers of the river." The latter part of which instruction, the court refused to give; but charged the jury, that although steam-boat owners were common carriers, and as such, would only be excused from the discharge of their trust, by the act of God, or a public enemy, that yet they could enter into a special contract, varying their common law liability: and if they believed from the testimony, that they had entered into such a contract, in which they had protected themselves against "the dangers of the river"—and if they believed from the testimony, that according to the sense, practice and understanding of the merchants, planters and others, in the State of Alabama, by these words was meant an accidental fire, not attributable in any manner to the want of care, intelligence, skill, or honesty, of those who had the control of the boat, they would find a verdict for the defendant—if this was such an accidental fire as before mentioned. But that the want of proper diligence, care, skill, &c. would not excuse the carrier, even though they should find that his special contract protected him as above mentioned.

From the judgment of the Court below, there was a writ of error to this court, and the case came on for hearing at the present term.

And the plaintiff said that in the record and proceedings and judgment below, the following errors had intervened :—

1. The court erred in not charging the jury in the

manner requested by plaintiff, as stated in the bill of exceptions.

2. The court erred, in overruling the objections offered by the plaintiffs to the introduction of the defendant's evidence, to shew what, according to the custom, usage and understanding of merchants, planters and others, was the meaning of the words in the bill of lading, "the dangers of the river."

3. The court erred, in refusing to instruct the jury, that steam-boat owners were to be considered as common carriers, and, as such, liable for the delivery of all goods shipped on board their boats, unless they were disabled from making such delivery, by the act of God, a public enemy, or some accident otherwise naturally arising out of the element of water; and that the accidental destruction of the boat by fire, was not within the meaning of the exception, to wit, the dangers of the river. And that the judgment and proceedings were in other respects erroneous.

*Ellis* and *Peck*, for the plaintiffs in error.
*Hopkins*, contra

ORMOND, J.—This is an action brought by the plaintiffs against the defendant, as a common carrier. The declaration is against him as a carrier at common law. The questions which are made in the cause, arise out of a bill of exceptions, which was taken by the plaintiffs, at the trial—the material parts of which are the following.

The bill of lading, signed by the plaintiffs and used as evidence, was in these words.—" Shipped in good order and well conditioned, (by the plaintiffs,) on board the steam-boat, Mobile, whereof Young is Master, now lying at Claiborne, and bound for Mobile, (certain bales of cotton,) marked, &c., to be delivered in the like good order and condition, at Mobile, (the dangers of the river only excepted,) unto (the con-

6p                    17

signees,) or assigns, paying, &c.   In witness whereof, &c.

The defendant proved that the fire originated in the hold of the boat; that the hold was entirely filled with cotton at Montgomery, and the hatches then closed, two days before the fire occurred, and that no lights or fire had been introduced into the hold : that the fire was first seen, bursting up perpendicularly through the deck, from the hold, and the flame then had the size and appearance of the flame of a candle ; that it burst out thus, about four feet behind the ash-pans and furnaces : and that the space between the place where the fire burst out, and the ash-pans and furnaces, was sheathed with copper.   The defendant further proved, that the cotton placed in the hold at Montgomery, was taken in during a rain ; and that the officers and crew did every thing in their power to arrest the fire, and save the boat and cargo.

The defendant then offered witnesses, to prove the meaning of the words inserted in the bill of lading, viz : " dangers of the river only excepted," when such bill of lading was given for goods shipped on board of a steam-boat.   This was objected to by the plaintiffs, but allowed by the court.

The plaintiffs then proved, that an accidental fire, by which the boat and cargo were destroyed, and which was not attributed to any want of diligence, care, skill or integrity, on the part of those entrusted with the management of the boat, was, according to the general sense, practice and understanding of the people of the State of Alabama, including merchants, planters, boat-owners and others, within the meaning of the exception in the bill of lading, to wit, " dangers of the river."

The plaintiffs requested the court to charge the jury, that steam-boat owners, were, in legal contemplation, common carriers, and were liable, as such, for the delivery of all articles shipped on board their

boats, unless they were disabled from making such delivery, by the act of God, a public enemy or some other cause, naturally arising out of the element of water; and that the accidental destruction of the boat by fire, was not within the meaning of the exception, " dangers of the river,"—the latter part of which instructions the court refused to give; but charged the jury, that although steam-boat owners were common carriers, and as such, could only be excused from the discharge of their trust, by the act of God or the public enemy—that yet, they could enter into a special contract, varying their common law liability : And if they believed from the testimony, that they had entered into such a contract, in which they had protected themselves against the dangers of the river—and if they believed from the testimony, that according to the sense, practice and understanding of merchants, planters and others in the State of Alabama, by these words, was meant an accidental fire, not attributable, in any manner to the want of care, intelligence, skill and honesty, in those who had the control of the boat, they would find a verdict for the defendant, if this was such an accidental fire first before mentioned. But that the want of proper care, skill and judgment, would not excuse the carrier, even though they should find that his special contract protected him, as above mentioned. To this charge of the court there was an exception. A verdict was found for the plaintiffs. The above charge of the court is now assigned for error.

This is a case of the highest importance. In a country where property to such a vast amount, is annually transported to and from the sea-board, by the agency of common carriers, the precise character of the stipulations entered into by the parties, and the rights and obligations thereby created, should be clearly ascertained and plainly defined.

There is not, and indeed could not be any contro-

versy, about the obligation which the common law imposes on a common carrier. If that rule is to be applied to the defendant he is clearly liable for the value of the cotton ; although there cannot be any doubt, that the fire by which the cotton was consumed, was not caused by the negligence or want of skill of the captain or crew of the boat, on which the cotton was shipped—but was, in all probability, a case of spontaneous combustion.

The precise question here presented, for the first time in this State, is, whether a carrier can be allowed to explain the meaning of the words, "dangers of the river," in a bill of lading, at the place where the contract is made. The natural import of the phrase, would seem to refer to those accidents which are peculiar to the element of water : and the attempt, in this case, is to shew, by parol proof, that the phrase in question, is of much larger import—and was understood by the parties, to exempt the carrier, from all losses, not attributable to his negligence, want of skill or honesty.

As courts of justice sit to expound and enforce the contracts, which parties litigant before them, have made, it is the plain dictate of natural justice, that proof, shewing what the contract is, should be allowed to be made, if the evidence can be heard by the court, consistently with those rules which have been established for the ascertainment of truth.

It is insisted, that the words, " dangers of the river," in a bill of lading, have a plain, ascertained meaning, and that, to permit it to be explained by parol proof, would, in effect, be to permit a written instrument to be varied by parol. If it be liable to this objection, it will be fatal to its admission,—for, however great the injury might be, in this particular case, it would be better to submit to it, than to introduce into our system of jurisprudence, a principle so fraught with mischief.

It is true, that in general, when an ambiguity exists on the face of a written instrument, it is the province of the judge to explain it.   But it frequently happens that the usage of trade, and the practice among merchants, is absolutely necessary to be known, to a proper understanding of their contracts.   At first these usages and customs are proved, as evidence of the intention of the parties, and are at length, silently incorporated into the body of the law, and recognised by the courts.

It is a matter of no monent whether this is considered an exception to the general rule, or whether it is esteemed a resort to the proper authority for an authoritative exposition of the language used by the parties.   Words are but the vehicles of thought, and if, by the usage and practice of one class of the community, words are used in a sense, different from their acceptation among others, not engaged in the same pursuit, it would be the height of injustice, to interpret their language by a rule, not within their contemplation at the time of making the contract, and thereby subject one of the parties to the penalty of a contract he had never entered into.

That to permit proof to be made in similar cases, has long been considered as the settled law, both in England and the United States, an examination of a few leading cases will shew. In Abbot on Shipping, 254, a case is cited, which happened in the reign of Charles the 1st.   To an action of covenant, on a charter party, which contained an exception of the perils of the sea, the defendant pleaded that the ship was taken, by hostile persons, armed in a warlike manner—and thereupon, the question, whether such a capture was within the exception, was brought before the court by a demurrer, in the most strict technical form.   The court, however, took the opinion of several merchants, by certificate in writing, and afterwards by examination in open court, upon the meaning of the words of

this exception, as established by usage among them, and decided in conformity to such opinion.

The case of *Gooden vs. Little*,* is expressly in point with the one at bar. The suit was against a common carrier, for injury to goods entrusted to his care. The declaration contained a special count on the bill of lading, which contained an exception similar to the one under consideration, and a count against him as a carrier at common law. On error to the Supreme Court of Pennsylvania, Chief Justice *Tilghman* and Judge *Duncan* determined, that the words in the bill of lading (" unavoidable dangers of the river") might be explained by proof of a usage, to ascertain the construction of the contract.

The same principle has been determined by the Supreme Court of the United States, in the case of *Renner vs. The Bank of Columbia*.† The case arose out of a custom of the banks in the District of Columbia, to make demand and give notice on the fourth day of grace.

As there is no difference in law between these conditions of a contract which the law implies, and those which are expressly stipulated, it might have been in that case, as in this, insisted, that proof of any usage or custom, different from that implied by law, was inadmissible. It was so insisted; but the court held, that on proof of the usage, the action could be maintained—saying, " that evidence of usage or custom is received for the purpose of ascertaining the sense and understanding of parties, by their contracts, which are made with reference to such usage or custom ; for the custom then becomes a part of the contract, and may not improperly be considered as the law of the

---

* 8 Scargt. & Rawle, 551.
† 9 Wheaton, 585.

contract, and it rests on the same principle as the doctrine of the *lex loci.*" See also *Jones vs. Fales.**

In the case of *Cole vs. The Com. Ins. Com.*† parol evidence was admitted to shew that by the general usage and custom of merchants and under-writers in New-York, the word " roots," in a policy of insurance, was confined to such roots as were perishable in their nature, and that sarsaparilla was not a root perishable in its nature, or included in that term in the memorandum of the policy. It is conceived that the principle of this decision is fully in point.

In Great Britain the principle has been settled in a multitude of cases. The case *Cutler vs. Powell,*‡ goes at least as far as any of the American cases. The action was brought by an administrator for work and labor done by his intestate. The captain of a ship had given a note to the deceased, by which he promised to pay him a sum of money, provided he proceeded on a voyage, and continued to do duty as second mate, to the port of destination. He died before reaching it, and the action was brought to recover for the services actually rendered. The legal effect of this contract was plain. The right to recover any thing by its express terms, depended on the performance of services to the place of destination : yet the Court of King's Bench held that it was allowable to show the usage and custom of merchants to pay a rateable proportion of the wages, notwithstanding the legal effect of the contract, unexplained by such usage or custom.§

It was attempted in argument to evade the force of the decision made in 9 *Wheaton,* and others here cited, because it appeared in these cases, that the party sought to be charged, knew of the existence of the

---

*4 Mass. 252—9 ib. 155—3 Conn. R. 13—Peters' C. C. Rep. 225—1 Gallison 443—3 Day's Rep. 346.
†7 Johns. Rep. 385.                    ‡6 Term Rep. 320.
§See also, Douglass' Rep. 511, and 6 East, 202.

usage. But it is plain that the decision did not turn on that fact. There is no difference between those presumptions which the law makes of the existence of a particular fact, from the proof of the existence of other facts—and proof of the fact itself. In other words, when the law raises the presumption of the existence of a fact, the presumption is itself proof of the fact. Where a custom or usage is proved to exist, in relation to a particular trade or pursuit, if it be general, all persons engaged therein, are presumed to contract in reference to such usage. Thus, in the case of *Mills vs. The Bank of the United States*,* it is determined that " where a note is made, for the purpose of being negotiated, at a Bank, whose custom is to demand payment and give notice on the fourth day of grace, that such custom forms a part of the law of the contract, and it is not necessary that a personal knowledge of the usage should be brought home to the indorser."† But in this case, the objection, if it were valid, could not be sustained, as the jury have found that the contract was made in reference to the usage.

It was also objected, that the evidence established a custom general throughout the State, and if so, it was part of the law of the land, and should have been pronounced by the court, and not left to the jury.— But the court below, (and this court,) were bound to take notice that no such usage or custom has obtained here a sufficient length of time, to have the force of law. In all cases where a custom or usage has been engrafted on our system of jurisprudence, so as to become a part of the unwritten law, there must have been a time when it began to be, at which time, as the court could not take judicial notice of it, it must have been proved not as law, but as evidencing the intention of the parties. What length of time, or what se-

---

*11 Wheat. 431.      † See also 1 Caine's 43, and Douglass, 518.

ries of judicial determinations is necessary to ripen a custom or usage into law, it is not necessary now to determine.    It is sufficient that such was not the fact when this case was tried.

It would be a waste of time to multiply cases to establish the effect that usage and custom have upon contracts, made in reference to such usage or custom. The cases which have been cited, and many others, might be adduced, conclusively to establish the proposition maintained in this opinion.

It is not intended to invade the general principle, that a written instrument cannot be contradicted or varied by parol proof. A charter-party, bill of lading, or other mercantile instrument, when clear and unambiguous in its terms, and not made in reference to any usage or custom, is not any more than any other instrument of evidence, to be impugned by parol proof.

There was no error in the charge given by the court below, or in the refusal to the charge as moved by the plaintiffs in error, and the judgment must be affirmed.

GOLDTHWAITE, J. not sitting.