------o------

WALLACE *v.* MORGAN and Another.

USAGES OF TRADE.—Local customs may exist and be confined to a particular locality, by which the trade of such place, and the rights and duties of persons engaged therein, may be controlled. Page 402.

SAME.—To render such a custom valid, to control a general principle, it should be well defined, in general use at the place by those engaged in the business to which it is applicable, and of such standing as to raise a reasonable presumption that it was known to those making shipments to such place; it should be uniform, and so well settled that persons in the trade must be considered as contracting with reference to it. Page 403.

SAME—PLEADING.—Where a usage is set up in conflict with general principles, the averments should bring the case clearly within the rule. Page 403.

SAME.—A local custom authorizing the local factor in his own discretion, without the assent or knowledge of his principal, to ship goods consigned

to him, for sale in his own market, to a factor of his own choosing, unknown to the principal, in a different and distant market, is unreasonable.

SAME.—A custom of commission merchants in *Indianapolis* to forward to *New York*, for sale, flour of a grade unsuitable for sale in the markets of *Indianapolis*, is void for uncertainty. Page 407.

INSTRUCTIONS.—The instructions should be relevant to the issues in the case and pertinent to the evidence given to the jury. Page 409.

AGENCY—RATIFICATION.—When a principal is fully informed of the acts of his agent, it is his duty, within a reasonable time, to either affirm or disaffirm, and if he fails to do so, affirmance may be inferred from his silence Page 413.

APPEAL from the *Marion* Common Pleas.

ELLIOTT, J.—*Morgan & Vorhis*, the appellees, sued *Wallace*, the appellant, for an alleged conversion of seventy-four barrels of flour, shipped by them to *Wallace*, as commission merchant, at *Indianapolis*.

The complaint, in substance, is as follows: That on the 13th day of *September*, 1861, the defendant being a commission merchant at the city of *Indianapolis*, the plaintiffs, who are partners under the name of *Morgan & Vorhis*, forwarded to the said defendant, at his place of business, seventy-four barrels of flour, of the value of $370, being of the value of $5 a barrel; that the defendant received and undertook to sell the same promptly for a reasonable compensation, at the best market price, and account to the plaintiffs for the proceeds thereof. Breach, that the defendant, though specially thereunto requested on the 18th day of *September*, 1862, has never accounted for said flour or the proceeds thereof, but has converted the same to his own use, to the plaintiffs' damage $500, etc.

The defendant answered in three · paragraphs: 1. That the flour was of a quality that would not sell in the city of *Indianapolis*, and that on the 27th of *September*, 1861, he shipped it to *Hill, Anthony & Co.*, commission merchants in the city and state of *New York*, then known and reputed as a safe, solvent business house, and doing business as commission merchants in said city of *New York*; that afterward he informed the plaintiffs of said shipment, and

gave them the name of the firm to whom it was made, and that they thereupon approved the same; that *Hill, Anthony & Co.*, on the 30th of *October*, 1861, disposed of said seventy-two barrels of flour for $320. Soon after which, and before said defendant could collect from them the proceeds of the flour, they failed, and became wholly insolvent, whereby the proceeds of the flour were lost.

3. Set-off. To these paragraphs the plaintiff replied in denial.

The *second* paragraph is as follows: "That on the 17th day of *September*, 1861, he was a forwarding and commission merchant, doing business in the city of *Indianapolis, Indiana;* that on the day named he received, as such forwarding and commission merchant, a shipment of flour from plaintiffs, consisting of seventy-two barrels, being the same mentioned in the complaint. By the usage and custom of commission and forwarding merchants in said city of *Indianapolis*, flour of a grade not suitable for market and sale in said city, was in the absence of special instructions, forwarded to the city of *New York*. The flour mentioned in the complaint was of a quality not suitable for market and sale in said city of *Indianapolis*, and no special instructions were given defendant relative to the sale of said flour." The paragraph then avers that on the 27th of *September*, 1861, the defendant shipped the flower to *Hill, Anthony & Co.*, of the city of *New York*, who sold it for $370; that *Hill, Anthony & Co.* soon after the sale of the flour became insolvent, without having accounted for the proceeds, whereby the same are lost, etc. To this paragraph a demurrer was sustained, to which the defendant excepted. The issues on the first and third paragraphs were tried by a jury. Verdict for the plaintiff. Motion for new trial overruled, and exceptions. Judgment for the plaintiff. The defendant appeals.

The evidence is made a part of the record by a bill of exceptions.

The first error complained of is the ruling of the court below in sustaining the demurrer to the *second* paragraph of the answer.

The paragraph of the answer to which the demurrer was sustained admits that the flour was shipped to the appellant at *Indianapolis*, for sale, as a commission merchant. Such a shipment, in the absence of special instructions, implies at least that the article shipped is to be sold at the place of the factor's business; in this case, at the city of *Indianapolis.* It was not sold there; but, at the expiration of six days from its receipt, the factor, without any special authority from his principals, shipped it to *Hill, Anthony & Co.*, at the city of *New York*, for sale by them in that market. *Hill, Anthony & Co.* sold it, became insolvent, and never accounted for the proceeds. The appellant attempts to justify the shipment to *New York* by averring that the flour " was of a quality not suitable for market and sale in the city of *Indianapolis*," and that " by the usage and custom of commission and forwarding merchants, in said city of *Indianapolis*, flour of a grade not suitable for market and sale in said city was, in the absence of special instructions, forwarded to the city of *New York.*" Do the facts thus averred constitute such a commercial usage as to justify the appellant in shipping the flour to *Hill, Anthony & Co.*, and thereby require the appellees to sustain the loss? It is said that " the usages of commerce regulate the duties and privileges of commission merchants, and generally form their contracts in business, which usages are matters of fact, and susceptible of proof." *Rapp* v. *Grayson*, 2 Blackf. 130. Commerce, in a great measure, is regulated and controlled by certain general and well-defined usages, growing out of the necessities and conveniences of trade, by which the rights and duties of parties engaged in commercial pursuits, in their different relations to each other, are defined and understood. Local customs or usages may exist and be confined to a particular locality or city, by which the trade of such place, and the rights and

duties of persons engaged therein, may be regulated and controlled. Such is the character of the custom attempted to be set up in this case.

To render such a custom valid to control a general principle, it should be well defined, be in general use at the place by those engaged in the business to which it is applicable, and of such standing as to raise a reasonable presumption that it is known to those engaged in making shipments to such place. It should be uniform, and so well settled that persons in the trade must be considered as contracting with reference to it. *Renner* v. *Bank of Columbia,* 9 Wheat. 581, and note at the end of the case. And where, as in the present case, such a usage is set up so much in conflict with general principles, we think the averments should be such as to bring the case clearly within the rule. Here there is no averment that the alleged custom is general or uniform among merchants of the class at *Indianapolis,* or that it had existed for any considerable period of time; for aught that appears, it may not have been in existance at the date of the shipment by the plaintiffs.

Two at least of the requisites laid down by *Blackstone* in his Commentaries, (1 vol. side p. 78,) to make a particular custom good, we think, are applicable to commercial usages; to-wit: they must be *reasonable* and *certain.*

Tested by these rules, is the alleged custom good? *First,* is it reasonable? The legal inference, arising from consignments to a local factor is, that he is to sell to the best advantage in the local market where he is doing business; this rule is violated by the usage set up. The factor is a special agent, and bound to observe the utmost good faith toward his principal; it is a personal trust, and can not be delegated to another, whose ability and integrity might not be known to the principal, or if known, might not be selected by him for such a purpose. This is the uniform general rule, both at common law, and by general commercial usage. Story on Agency, secs. 13, 14, 34;

Chitty on Con. 225; 1 Par. on Con. 72; Par. Com. Law, 155. The exceptions are: 1. Where the business is such that, obviously and from its very nature, it can not be done by the agent otherwise than through a substitute. The *second* is, where there exists in relation to the business a known and established usage of substitution. 1 Par. on Con. 72, and other authorities, *supra*. This latter exception relates ordinarily, if not uniformly, to the appointment of sub-agents, at the place of consignment, to effect or facilitate the sale of the goods in that market; such as the appointment of a broker, or ministerial agent, where the established usage requires or justifies it. So the general rule requires sales to be made for cash, and the factor is liable, if he sell on credit; but, in the absence of instructions to the contrary, an established local usage may justify a sale on credit. The usage here set up, it will be recollected, is not in reference to the sale of flour in the city of *Indianapolis*, and defining the powers and duties of factors in reference thereto, which would seem to be the proper subject matter for local usages in such cases, but to authorize the local factor, in his own discretion, without the assent or knowledge in fact of the principal, to ship the goods consigned to him for sale in his own market to a factor of his own choosing, unknown to his principal, in a different and distant market, at his principal's risk, and, in case of loss, without any responsibility upon himself. In this case, in the absence of the alleged local usage, or knowledge in fact of its existence, the reasonable presumption would be that the plaintiffs, with a knowledge of the various markets, preferred to risk that of the city of *Indianapolis;* that they had confidence in the integrity of *Wallace*, and therefore intrusted him with the sale of their flour in that market. They did not direct him, in any event, to ship it to *New York*. They could not have anticipated that he would do so, as he had no such power under the law or any general commercial usage. They did not authorize *Wallace* to appoint for them an agent or factor in

the city of *New York*, and could not anticipate that he would so do without any authority. And it may be presumed that, though they trusted him to sell the flour at *Indianapolis*, they would not be willing to trust to his judgment and discretion in selecting another market, and a factor to whom to make the consignment. Regarding, then, the direct conflict between the alleged local usage, and so many of the well-settled rules and general commercial usages governing the rights of consignees, and the obligations and duties of factors, we think the allowance of such a custom, and especially in the absence of positive knowledge of the consignor, as a reasonable one, of more than doubtful propriety.

The cases of *Wallace, Lambeth & Pope* v. *Bradshaw & Taylor*, 6 Dana, Ky. Rep. 383, and *McMorris* v. *Simpson*, 21 Wend. 610, are relied on, by the appellant's counsel, as sustaining the alleged custom set up in this case. In the former case, *Wallace, Lambeth & Pope*, as commission merchants in the city of *New Orleans*, received from *Bradshaw & Taylor*, of *Kentucky*, two hundred and eleven barrels of pork and one barrel of peach-brandy, in *January*, 1831; and in *April* of that year they advanced to *Bradshaw & Taylor*, on the faith of the goods, $1,200, there being previously a balance against them of $54.83. *Wallace, Lambeth & Pope* afterward shipped the goods to *Havana*, for sale, without authority from *Bradshaw & Taylor*. The latter then sued the former to recover the value of the goods in *New Orleans*.

On the trial of the case in the inferior court, the defendants offered to prove "that, by the custom and usage among commission merchants at *New Orleans*, a commission merchant, who had made advances on goods consigned to him from another state, had a right to ship them to another market for sale; but the court rejected the evidence, and the defendants appealed. Justice *Marshall*, in delivering the opinion of the Court of Appeals, in reference to the custom attempted to be proved in that case,

said : " Such custom must, indeed, be in subordination to the general and more authoritative law of the country or state in which the particular place is situated, and should have the qualities of universality, continuance, etc., belonging to a good custom.

"It is not unreasonable or unjust that a commission merchant, receiving goods on general consignment from a distant owner, and making advances therefor, should, in consideration of the interest he has acquired in the goods, and for his own safety, be authorized, under certain circumstances, at his discretion, and for the benefit of himself and the consignor, to ship the goods to a more advantageous market, or one which may in good faith be presumed to be so, and especially when, as the evidence conduced to prove, a sale at *New Orleans* might not have indemnified them for their advances."

It will be observed that the custom in this case is based on the advancements made by the factor to the consignor; and its reasonableness is sustained by the court, exclusively because of such advancements and the interest acquired by the factor in the goods thereby. In the case at bar, the alleged custom rests on no such equitable basis, and therefore it can not be claimed that the former furnishes any authority for its existence.

The case in 21 Wend. is in no wise applicable to the question under discussion. In that case the plaintiff and defendant were both farmers, residing in the county of *Delaware*. The defendant, when he went to market with his own butter, had been in the habit of taking and selling butter for his neighbors, for a commission of fifty cents per firkin. The plaintiff called on the defendant, and asked when he was going to *New York*, and told him that he had left eleven firkins of butter at *Catskill*, and requested the defendant to take it, *and do the best he could with it.* Nothing was said about where it was to be sold. The defendant told the plaintiff he would do as well by it as if it was his own, and then asked the plaintiff if he had put

any price on the butter; the plaintiff answered no, but wished the defendant *to do* as well by it as if it was his own. The defendant took the butter, with his own, to *New York*, where he remained several weeks, endeavoring to sell the butter; finding the market dull, and the price unsatisfactory, he sent the plaintiff's butter, with his own and his son's, to the South to be sold. Afterward the plaintiff sued him for the eleven firkins of butter. On the trial, evidence was given tending to prove that the usual custom was to sell in *New York;* that the market was either *Catskill* or *New York,* though butter was sometimes sent South.

The court held that, under the circumstances of the case, the defendant was not liable in consequence of shipping the butter South; but the decision was based on the authority given him by the plaintiff, to do as well with the butter as if it was his own, thereby leaving the matter entirely to his own judgment and discretion. He had acted in good faith, as he shipped his own butter South at the same time. There is certainly nothing in the case to support the position assumed in the case at bar.

But is the alleged custom *certain?* It is, that "flour of a grade not suitable for the market and sale in the city of *Indianapolis* was, in the absence of special instructions, forwarded to the city of *New York.*"

It may well be asked, to what grade of flour does this alleged custom apply to render it certain? The allegations imply that flour of some grade or grades is suitable to the *Indianapolis* market. If the custom defined that quality, then it might be inferred that all other grades were excluded, and should be shipped to *New York.* Or, if the custom defined the particular grades that were not suitable to the *Indianapolis* market, then the commission merchant, on the receipt of flour of the condemned grades, would at once know his duty. The plaintiff's shipment consisted of two different grades, single X and XXX, and yet both are condemned as unsuitable. The question involved concerns the shipper quite as much as it does the

factor, and it is important for him, in his effort to become a competitor in the *Indianapolis* market, to know what grade of flour is suitable to the tastes of those depending on that market for supplies, or that may be demanded by the particular use to which it may be applied. Or, if certain grades are to be condemned as unsuitable, and, under the alleged custom, sent to *New York*, to know what such grades are. If such a custom exists among the commission merchants of that place, and is certain and well defined, they should be able at once, by the inspection of the brand or quality of flour, to determine it promptly.

The alleged custom, it seems to us, is void for uncertainty; because, by its terms, as stated in the pleading, it is impossible to determine what grade of flour is, and what is not, subject to its provisions, and condemned to be shipped to *New York*. It would seem to leave each factor to determine from his own judgment, if not his own peculiar tastes, to what grades the custom applies. If each day is to determine its application, making it apply to one grade to-day and to another to-morrow—if at one period it applies to all grades, and at another to none—it is not only wholly uncertain, but is misnamed "a commercial usage."

We think the court did not err in sustaining the demurrer.

During the trial of the cause before the jury, the defendant, having been sworn, offered to prove by his own evidence, that the flour was of a quality that could not be sold in *Indianapolis*, and "that the general usage and custom of commission merchants of said city of *Indianapolis* was to forward such flour as was consigned to them, of a quality not suitable for sale in *Indianapolis*, to *New York* city, to be there sold." The court refused to permit the evidence to go to the jury, to which proper exceptions were taken. This ruling of the court is also assigned for error.

The appellant insists that the evidence was proper

and should have been admitted, under the first paragraph of his answer, as tending to prove a ratification by the plaintiffs below of his shipment of the flour to *Hill, Anthony & Co.*, at *New York*, upon the ground that, if such a custom existed, the plaintiffs were bound to take notice of it; and that, if it did exist, that fact would tend strongly to prove a ratification or approval of the shipment, and thereby add strength to the other evidence on that point.

We have already held that the matter set up could not amount to such a commercial usage as to justify the shipment; and we fail to see how the evidence offered could have any legitimate bearing on the question of the plaintiff's subsequent ratification or approval of the shipment to *New York*. It did not legally tend to prove the fact, and was therefore properly ruled out.

The next error assigned is, that the court erred in giving improper instructions to the jury, as to the question of ratification of the shipment of the flour to *Hill, Anthony & Co.*, and in refusing instruction asked by the defendant on the same point. One of the reasons assigned for a new trial embraces the same matter.

It is a well-settled rule of the law, that the instructions of the court to the jury should be relevant to the issues in the case, and pertinent to the evidence given to the jury. It is proper, therefore, as the evidence in the case is in the record, that we should look to it first, and then examine the instructions complained of, and determine whether the case was fairly presented to the jury on the questions of law arising on the evidence. The evidence shows that the flour was received by *Wallace*, at *Indianapolis*, on the 17th of *September*, 1861, under the following letter of instructions to him from the plaintiffs:

" *Trafalgar, Indiana, September* 12, 1861.
"*Andrew Wallace: Sir*—We ship you this day seventy-four barrels of flour; forty barrels is made out of light

wheat, branded with only one X; the balance is made from good wheat, and is branded XXX. You will please sell it for us at the best advantage, and remit net proceeds to us at *Trafalgar*. Send check on some of the banks at your city, as it will suit us just as well, and can be sent by mail. Please keep proceeds of each parcel separate, as X flour does not belong to us. We would like for you to sell as soon as you can conveniently.

"MORGAN & VORHIS."

Wallace testified in reference to the flour: "Placed flour in my warehouse; overhauled it; was not suitable for this market; sold two barrels at $4.50 each; they were returned as the flour was not suited to this market; I shipped to *Hill, Anthony & Co., New York* city." The bill of lading given by the railroad company to *Wallace* of his shipment to *Hill, Anthony & Co.* was then given in evidence, dated "*Indianapolis, September* 23, 1861," and is for seventy-two barrels of flour.

*Wallace* further testifies: "Saw *Morgan* after shipment; was here twice; sold him two bills of goods—*October* 17, and *November* 12, 1861. I told him I had shipped his flour to *Hill, Anthony & Co., New York*; said nothing against it; don't exactly recollect what he did say; offered to sell him more goods, saying I could take it out of proceeds of the sale of flour, but he wanted no more goods; tried to sell more goods, as I was confident of getting money for flour; *Hill, Anthony & Co.* were reputed good and solvent, and prompt business men." A letter from *Hill, Anthony & Co.* was here given in evidence, dated "*New York, October* 26, 1861," addressed to *Wallace*. We extract so much of it as is pertinent to the questions involved: "Yours of the 23d is before us, and all you say carefully observed. Your draft, as stated, $283, will be cheerfully honored on presentation. Your shipment reached us two or three days since, very much used up, being muddy and in bad order. We have worked hard to meet your expectations by obtaining

$6, but could not quite reach it. We have sold seventy-two barrels to-day at $5.95, and will send you account of sale in a day or two. We think the *Trafalgar* a good honest flour, and when a little better known here, would sell freely at good prices."

*Wallace* further testifies: "I drew a draft for $280; returned dishonored; tried through another house to collect, but got nothing." Neither the date of the draft or its dishonor is given.

On the 25th of *November*, 1861, *Wallace* wrote the plaintiff as follows:

"*Indianapolis, November* 25, 1861.

"Messrs. *Morgan & Co.: Gents*—Your order came to hand. I am waiting for salt, and will fill your order. . As to the flour, I fear it will be a total loss. I have done the best I could as your agent, and you will have to loose the whole. I will do my best to save it. This is my first shipment of flour lost, if it should turn out lost.

"Yours truly, ANDREW WALLACE."

On cross examination, *Wallace* testified that this was his first shipment to *Hill, Anthony & Co.;* that the draft referred to in their letter was drawn on this flour. No account of sale had then been furnished, and the draft was drawn on a conjecture of the probable amount, and was payable *three days* after sight.

*Ezekiel Morgan,* one of the plaintiffs below, testifies: "Mill at *Trafalgar,* seven miles south of *Franklin;* the XXX brand good, and X not so good grade; flour XXX brand worth $4.50 per barrel in *Indianapolis;* we did not ship any X grade to sell in this market before. In *October,* 1861, about the middle, I called at Mr. *Wallace's* store; had never had any receipt from *Wallace* for the flour; introduced myself to *Wallace; Wallace* says, 'was not at home when flour received; when I came home I found freights going up, and shipped it at once to *New York.*' My reply was, that this was a bad business; did not send such flour

East; shipped my flour East to *Boston* myself; that I did not ship through any agent. Bought a bill of goods of *Wallace;* proposed to pay for them, but *Wallace* said no, he could take it out of the proceeds of the flour; told him my mill business and store were separate concerns, but he need not keep separate accounts, as I could settle with my partners; the two little bills had no concern with *Morgan & Vorhis.* Came back about 13th of *November;* had heard nothing of my flour; went to *Wallace's* counting-room; *Wallace* came in; did not at first know me; he said I ought to have written you about that flour, I am afraid we are going to have trouble about that flour; don't recollect what I said, but I bought more goods; *Wallace* said, just take what you want, and I will take it out of the proceeds of the flour; you had better take it out, or may be you will never get any thing." Witness further testified that afterward he sent *Wallace* an order for some salt, when, in reply, *Wallace* wrote him the letter of *November* 25, 1861; that in the conversation between him and *Wallace* in *November,* the latter said that he had foolishly drawn on time; that he did not know who *Wallace* had shipped the flour to; did not think *Wallace* told him.

It was also shown by several depositions of witnesses, taken in the city of *New York,* that the firm of *Hill, Anthony & Co.* was in good standing and repute up to the time of their failure, the latter part of *October,* 1861. Among them is the deposition of *R. S. Hill,* a member of the firm, who testified that they failed on the 28th of *October,* 1861, and that he presumed the fact of their failure was known in the business community the day following.

Under this state of the evidence, the defendant below moved the court to instruct the jury as follows:

"If the plaintiffs, or either of them, with knowledge of the facts, ratified the act of defendant, either by expressly assenting to it, or silently acquiescing in it, such ratification is equivalent to a precedent authority; that is, the

same precisely as though the authority had been given before he performed the act. Nor can a principal adopt a portion of the agent's acts and reject another portion; and if therefore the plaintiffs, with the knowledge of *Wallace's* act, if such knowledge was communicated to them, did not by some act or language disavow his act, then it amounts to a ratification of his proceedings." The court refused to give the instruction so asked, but intructed the jury as follows: "The burden of showing a ratification by a preponderance of evidence is upon the defendant. Ratification in this case must be some act or declaration of plaintiff's, with full knowledge of all the facts showing an intention to adopt the act of the defendant."

By reference to the leading authorities found in both elementary works and books of adjudicated cases, however different the mere mode of expression, we think there will be found no substantial difference in principle, as to the law governing the relation of principal and agent, and as to what is necessary to constitute ratification or affirmance by the principal of the unauthorized act of his agent. From the authorities, we understand the general rule to be, that the principal is not bound by the unauthorized act of his agent, unless he subsequently ratifies or confirms it. He may affirm or disaffirm at his own pleasure, when informed of the fact; but his affirmance is not presumed, unless, from his conduct, his acts, or words, such an inference may be reasonably drawn. When fully informed of the facts, it is his duty, in a reasonable time, to either affirm or disaffirm, and if he fails to do so, affirmance may be presumed from his silence. The period of time requisite to raise a presumption of affirmance must depend upon the circumstances of each particular case. The principal can not be allowed to wait until it may be determined whether the act may prove profitable or otherwise; and if the rights of others are involved, and may be jeoparded by delay, then it is his duty, as soon as the facts

are fully brought to his knowledge, promptly either to affirm or disavow the act, and from a failure to do so an affirmance should be presumed. See 1 Par. on Con. 44, 71, 72; 2 Greenl. Ev. 50, sec. 66; 2 Kent's Com., marg., pp. 614, 616; *Lord* v. *Bleecker*, 12 Johns. 300, and the various authorities cited.

The instruction under consideration asked by the defendant and refused by the court, if for no other reason, was correctly refused because a portion of it was not applicable to the facts of the case in evidence. The latter clause of it is, "Nor can a principal adopt a portion of the agent's acts, and reject another portion; and if, *therefore*, the plaintiffs, with the knowledge of *Wallace's* act, if such knowledge was communicated to them, did not by some act disavow his act, then it amounts to a ratification of his proceedings."

This clause assumes that the plaintiffs had adopted a portion of the acts of *Wallace*, and claims that *therefore*, because they had done so, it amounted to a ratification of his proceedings, unless, by some act or language, they did, at the time that knowledge of *Wallace's* acts was communicated to them, disavow his act. There is nothing in the case, or the evidence, tending to show that the plaintiffs had adopted a portion of *Wallace's* acts, and were attempting to disavow another portion. The effort is to show that, by their conduct and *silence*, the plaintiffs are presumed to have affirmed all *Wallace* did; while, on the other hand, it is insisted that they disavowed the whole.

We think the law of the case, arising from the evidence, was fairly given to the jury in the instruction given by the court; but, however that may be, the case should be affirmed, on the ground that the verdict is clearly right from the evidence. The evidence of *Morgan*, one of the plaintiffs, clearly proves that, as soon as informed that *Wallace* had shipped the flour to *New York*, he condemned and disapproved the act. He testifies that, when *Wallace*

informed him of the shipment, he replied at once that it was a bad piece of business; that they did not send such flour East; that they shipped their flour East to *Boston* themselves, and did not ship through any agent. It can not readily be conceived what terms could have been employed that would more unequivocally condemn the act. Nor do we consider this statement disproved by, or in conflict with, the evidence of *Wallace*. True, he states in his evidence, in speaking of the same interview testified of by *Morgan*, and the conversation between them in reference to the shipment of the flour, that *Morgan* "said nothing against it; do n't exactly recollect all he did say." This is a tacit admission that *Morgan* said something about it; he might have said much. *Wallace* says he "do n't exactly recollect all he did say." He does not testify to *any thing* said by *Morgan;* he seems to make his own deductions from what he said, and comes to the conclusion that "he said nothing against it." *Morgan,* on the other hand, states what he did say, and *Wallace* does not attempt to contradict or deny it. The letter to *Wallace* at the date the flour was consigned to him, and by him produced in evidence on the trial, amounted, we think, to special instructions to sell the flour in *Indianapolis,* and not elsewhere; and should have controlled his conduct even in opposition to the alleged custom of commission merchants of that city. The shipment of it to *New York,* by which it was lost, was a clear violation of his duty and the rights of the plaintiffs; and the jury did right in finding against him.

There is nothing in the objection that the damages are excessive. The evidence was that the XXX flour was good, and worth $4.50 per barrel at the city of *Indianapolis;* but that the single X brand was not so good. The jury, upon the average, allowed but a fraction over $4 per barrel for the whole. We think the evidence justified the verdict, and the judgment should be affirmed.

Judgment affirmed, with costs.

*Byron K. Elliott,* for appellant.
*Lucian Barbour* and *J. D. Howland,* for appellees.