## CITIZENS AND SOUTHERN BANK *v.* UNION WAREHOUSE AND COMPRESS COMPANY.

1. To make a usage and custom of trade binding, it must be known, certain, uniform, reasonable, and not contrary to law.
   (*a*) An alleged usage or custom of trade which leaves some material element to the discretion of the individual is void for uncertainty, as the office of custom or usage is to interpret the otherwise indeterminate intention of the parties.
   (*b*) In interpreting a usage or custom the same rules apply as pertain to the interpretation or construction of other writings and documents.
   (*c*) A custom in the cotton trade that bales of cotton should average "around" or "about" or "in the neighborhood of 500 pounds per bale" is not void for uncertainty.
2. While it is unnecessary to determine whether the above averments of such custom or usage are superseded by other allegations in the petition which in effect allege that the articles by the custom should be of the definite weight stated, the pleading should be construed as a whole; and so construing it, such subsequent averments clarify the meaning of the former allegations on this subject, and strengthen the construction placed upon the alleged usage or custom. Duplicity arising from these different allegations, if any, could only be reached by special demurrer, as such lack of clearness would not render the petition subject to general demurrer.
3. Where a warehouseman, for cotton stored with him, issues to the owner his negotiable warehouse receipts in which the commodity is described only as so many bales, and neither the weight nor grade of cotton is stated or indicated, but at the time there is a universal, definite, and valid usage and custom in the trade in the locality of the transaction, known to the warehouseman, that bales of cotton should be of a given grade and weight, and if the bales of cotton for which such receipts are issued are below such customary weight and grade, and if the owner, for value received, assign such receipts to one who takes the same relying upon such custom, and without any notice of the actual weight and grade of such cotton, when the warehouseman at the time of issuing such receipts knew or "by the most casual inspection and in the exercise of the slightest ordinary care could and should have known" of the actual weight and grade thereof, the warehouseman, in an action brought against him by the assignee, in which the above

facts are alleged, will be liable for the difference between the actual value of the identical cotton stored and the value of the same if of the customary weight and grade, although the warehouseman tendered to the assignee the identical bales of cotton for which the receipts were issued.

(a) A universal, definite, and valid custom or commercial usage, which defines and fixes the weight and grade of bales of cotton, is to be read into and made a part of receipts given by the warehouseman for their storage.

(b) Where warehouse receipts are issued for bales of cotton without stating their weight or grade, parol evidence is admissible to prove the meaning of bales of cotton in the cotton trade or business; and to prove that a bale of cotton, according to the custom of the cotton trade, means a bale of a given weight and grade.

(c) Warehouse receipts should be construed in accordance with the rules applicable to the construction of contracts in general, and especially in accordance with commercial usage.

(d) Representations in warehouse receipts, when expressly embraced therein or read into them by custom or usage, should usually be confined to those of which the warehouseman may ordinarily be presumed to have knowledge, or of which he ought to know.

(e) Where a warehouseman issued receipts for bales of cotton without expressly stating or indicating their weight or grade, but where by custom or commercial usage such bales of cotton must be of a given weight and grade, and the warehouseman can, by the most casual inspection and in the exercise of the slightest ordinary care, know of their weight and grade, such warehouseman will be liable to a bona fide assignee of the warehouse receipts given for the storage of bales of cotton of the customary weight and grade.

(f) The issuing of such receipts gives to the holder thereof a false credit, if the bales of cotton do not come up to such customary weight and grade; and the warehouseman will be estopped to deny, as against a bona fide assignee of such receipts, that the bales are not of such weight and grade.

4. (5) Where a warehouseman issued his negotiable receipts for so many bales of cotton, neither the weight nor grade being indicated in the receipts, and where by the exercise of the slightest ordinary care he could have known the actual weight and grade of such bales, and at the time of issuing such receipts he knew that an assignee thereof would, independently of any custom or usage of trade, accept such receipts and believe the articles would be of a certain weight and grade, and where the assignee took assignments of the receipts for value under such expectation and belief, and where it afterwards appeared that the actual weight, grade, and value of such articles were far below the weight, grade, and value which the assignee expected at the time of taking such assignments, whereby he sustained loss, the warehouseman will not be estopped, in an action brought against him by an assignee to recover the difference between the value of such articles actually received and the value they would have had if they had conformed to the weight and grade the assignee expected, from showing that the identical articles were not of the weight and grade which the assignee

expected, the warehouseman not having done or said anything to the assignee to create such belief and expectation, and not having remained silent when, under the circumstances, it was his duty to speak.

(a) The principle, that when the parties differ among themselves as to the meaning of a contract, the meaning placed upon it by one of the parties, and known to be thus understood by the other party at the time, should be held to be the true meaning, applies only to the immediate parties to the contract, and has no application to the assignee of such contract, although one of the parties thereto, who is sought to be bound by such understanding, knew at the time of its execution that such assignee would take the assignment of the contract under the belief and expectation that it had a meaning different from that put upon it by such party.

(b) Nor would such estoppel arise upon the theory that the warehouseman had put it in the power of the bailor to injure third persons, and that when one of two innocent persons must suffer, the person who put it in the power of another to inflict injury must bear the brunt.

(c) No estoppel by conduct or silence would arise under the facts stated in this question.

5.(7) Where the tender by a warehouseman of the identical articles stored with him and for which he had issued receipts was accepted by the assignee of such receipts under protest and notice to the warehouseman at the time that the assignee, in accepting such articles, did not waive any right or claim he might have against him by reason of such receipts, such acceptance did not amount to an extinguishment of any right or claim which the assignee might have against the warehouseman by reason of his failure to comply with the terms of such receipts, it not appearing whether or not the warehouseman agreed that such acceptance might be made without such waiver, and it being assumed that the action is one ex contractu.

(a) While the acceptance under protest of the tender of a given amount made in full settlement of a liability extinguishes such liability, the acceptance of such tender upon condition that it shall not extinguish such liability does not work an extinguishment thereof.

6.(9) If a petition sets forth a cause of action, either ex contractu or ex delicto, it will withstand a general demurrer; and it is not the duty of the appellate court, in passing upon an exception to a judgment sustaining a general demurrer, to decide whether the action is one ex contractu or one ex delicto.

7.(10) If it is doubtful whether an action is based on tort or on contract, such doubt furnishes a ground for special demurrer; and if such special demurrer is sustained, the plaintiff may amend so as to clearly show why he is suing for a tort or for breach of contract.

(a) Where no special demurrer is filed to such action on the ground of duplicity in the petition, the plaintiff can elect upon which cause of action he will rely, if his petition sets out a cause of action which is good either as one for a tort or one for a breach of contract.

(b) A reviewing court, in dealing with an exception to a judgment sustaining a general demurrer to a petition, should adopt that construction which will sustain the petition and reject that construction which will defeat it.

8.(11) Where a complaint for fraud and deceit alleges in several para-
graphs that the defendant knew, or by the exercise of the slightest ordi-
nary care could and should have known, a fact material to the main-
tenance of the action, and where the plaintiff, by amendment to a specific
paragraph of the complaint, alleges actual knowledge by the defendant
of such fact, but there is no amendment changing such alternative allega-
tions in the other paragraphs, the appellate court, in passing upon an
exception to a judgment sustaining a general demurrer to the petition,
should construe the amendment as applicable to the whole suit.

(a) The petition thus amended might be subject to the special demurrer
on the ground that the paragraphs contain uncertain statements, but
it would not be subject to a general demurrer.

(b) The better practice would be to amend and change the alternative
allegations in each paragraph.

No. 3650.  FEBRUARY 13, 1924.

The Court of Appeals in Case No. 13536 requested instruction
from the Supreme Court upon the following questions involved:

1. If an action against a warehouseman, by the assignee of
negotiable warehouse receipts issued by the warehouseman for
cotton stored with it for safe-keeping, can be maintained only in
the event a custom and usage of trade as to the weight and grade
of the cotton be shown to have become, by implication, a part of
the contract (the receipts), neither the weight nor the grade being
shown in the receipts themselves; and if, assuming the action other-
wise maintainable, the measure of the recovery can be computed
only by reference to the weight and grade of the bales of cotton
covered by the receipts as fixed by the alleged custom,—is the
custom in respect to the weight of the cotton, as against a general
demurrer to the petition, shown to be sufficiently definite and cer-
tain as a standard by which the extent of the defendant's liability,
if existing, may be computed, where the allegations in respect to
the custom are set forth in the petition in the following language
and in the following consecutive order, to wit:   (a) Defendant
did by the issuance of said receipts "say and import that said
bales of cotton [1916 bales], or at least the great bulk of them,
were of the usual, customary, and merchantable weight and grade;
that is to say, of the average weight of 500 pounds."   (b) Said
defendant "did then and there know that said 1916 bales of so-
called cotton were not of the customary and merchantable weight
and grade; that is to say, of the average weight of 500 pounds."
(c) The defendant did then and there know "that said bales were
split or fractional bales of less than two thirds of the usual and

ordinary average 500-pound bales." (d) Where such warehouse receipts are issued for the purpose of being negotiated by pledge or otherwise "for cotton in lots of 100 bales more or less, . . it is usual and customary, and so understood in the trade, that said bales of cotton should average in the neighborhood of 500 pounds per bale." (e) That defendant knew, when it issued its receipts "for the purpose of being negotiated at bank, that the bank lending money or extending credit thereon would expect and have the right to expect that the bales of cotton specified in said receipts should be and were full and not fractional bales of cotton, averaging around 500 pounds per bale." (f) Plaintiff accepted the receipts "relying upon the representations in said receipts as customarily understood as aforesaid that the bales of the cotton therein mentioned were full bales of an average weight of 500 pounds." (g) That the defendant, in issuing the receipts upon which the plaintiff bases its action, issued "just such receipts as they [defendant] would have issued against a similar number of 500-pound bales of merchantable cotton," although the identical cotton for which the receipts were issued "were all split or fractional bales of less than two thirds of the usual and ordinary average 500-pound bales;" and where (h) the plaintiff then computes its alleged damage upon the definite basis of 500 pounds per bale? That is to say, assuming that the alleged custom, if valid, became, by implication, a part of the contract as evidenced by the receipts, and that the petition is otherwise sufficient, do such allegations as the above show that the alleged custom was sufficiently definite in respect to the weight of a bale of cotton to afford a sufficiently certain basis for computing the extent of the liability of the defendant to the plaintiff as claimed, or to be capable of enforcement as an alleged part of the contract?

2. In other words, where, in an action in a single count by an assignee or transferee of negotiable warehouse receipts against the warehouseman which issued them, it is necessary, in order to allege a cause of action and to set up a basis or standard for computing the extent of the defendant's liability as claimed in the petition, that the plaintiff shall show that a universal custom as to the weight and grade of the commodity for which the receipts were issued became, by implication, a part of the contract as evidenced by the receipts, and where the case is brought to this

court upon exceptions to the sustaining of a general demurrer to the petition, do the plaintiff's averments pertaining to the alleged weight of such commodity under the alleged custom set forth such weight with sufficient definiteness to afford a sufficiently certain basis for computing the defendant's liability as claimed, where it is respectively alleged that by such custom the articles for which the receipts were issued, "or at least the great bulk of them," should be of the usual, customary, and merchantable weight and grade, that is to say, of the average weight of a stated number of pounds; that the articles should "average in the neighborhood of" a given weight; that the articles should "average around" a given weight; although, besides the averments thus specifically referred to, there are at least five other averments in the petition which in effect allege that the articles, by the custom, should be of a definite weight stated,—assuming that, if valid, the custom became by implication a part of the contract; that is to say, if the averments more specifically herein referred to should be held to state a custom too indefinite as to the weight of the articles of the commodity, could these be superseded by the other allegations by which the alleged custom is shown to have been sufficiently definite as to the weight of such articles?

If both the foregoing questions Nos. 1 and 2 should be answered in the negative, answers to questions Nos. 3 and 4 will not be desired; but, in any event, we desire instructions in answer to the questions following No. 4.

3. If a warehouseman, for commodities stored with it for safe-keeping, issues to the owner its negotiable warehouse receipts in which the commodity is described only as so many articles, that is, without either the weight or the grade being stated or indicated in the receipts, but if, at the time of the issuance of the receipts, there is a universal custom and usage in the trade in the community of the transaction (assumed to be sufficiently definite and otherwise valid), known to the warehouseman, that the articles in such lots as are covered by the particular receipts should be of a given weight and grade (hereinafter called the "customary weight and grade"), and if the identical articles for which such receipts are issued are far below such customary weight and grade; and if the bailor for value assign such receipts to one who takes the same in reliance upon such custom, and without any notice of the

actual weight and grade of the identical articles for which the receipts were issued, and if the warehouseman at the time of issuing the receipts either knew or "by the most casual inspection and in the exercise of the slightest ordinary care could and should have known." of the actual weight and grade of the identical articles stored, may the warehouseman, upon appropriate allegations of the above-enumerated facts in an action against it by the assignee, be shown liable, as against a general demurrer to the petition, for the difference between the actual value of the identical articles stored and the value which the articles would have had if conforming to the alleged customary weight and grade, where it further appears by the petition that the warehouseman tendered to the assignee the identical articles for which the receipts were issued?

4. If question No. 3 should be answered in the negative, could the liability which it is sought to establish in such action be shown if the complaint could be construed as alleging, in addition to the facts above enumerated, that the warehouseman at the time of issuing the receipts had actual knowledge that the articles for which the same were issued were far below the weight and grade which the articles should have had if conforming in that respect to the alleged custom; and if then the further allegation be also considered, to wit: that the warehouseman thereupon did wrongfully, knowingly and fraudulently issue and deliver to the bailor its usual and customary negotiable warehouse receipts in the exact form and tenor in every particular as though all of said articles specified in said receipts were of the full, usual, and average weight (as contemplated by the alleged custom), and did thereby enable the bailor on the defendant's said representations in said receipts to defraud plaintiff in the sum sued for?

5. If a warehouseman, for articles of a commodity stored with it, issue negotiable warehouse receipts in which the commodity is described only as so many articles, that is to say, with neither the weight nor the grade being indicated in the receipts, and if the warehouseman by the exercise of the slightest ordinary care could have known the actual weight and grade of the articles so stored, and if at the time of the issuance of the receipts the warehouseman knew that an assignee of the receipts would, independently of any custom or usage of trade, expect and believe that the articles mentioned therein would be of a certain weight and grade, and if

the assignee take the assignment of the receipts for value in such expectation and belief, and if it thereafter appear that the actual weight, grade, and value of the identical articles so stored were far below the weight, grade, and value which the assignee at the time of taking the assignment expected and believed the same would have, with resulting loss to the assignee, would the assignee upon pleading the above stated facts, in an action against the warehouseman for the difference between the value of the identical articles for which the receipts were issued and the value which they would have had if conforming to the weight and grade which the assignee so expected, show cause for estopping the warehouseman from saying and claiming that the identical articles were not of the weight and grade which the assignee expected and believed the articles would have, at the time of taking the receipts by such assignments?

6. Would the answer to the last preceding question be the same, if the plaintiff's petition could be construed as alleging also that the warehouseman *actually knew* at the time of issuing its receipts that the weight, grade, and value of the identical articles stored were below the weight, grade, and value which the assignee so expected the same would have, at the time of the assignments, and that the warehouseman issued the receipts "knowingly, wrongfully and fraudulently," and did thereby enable the original bailor to defraud the plaintiff and did itself defraud the plaintiff in the sum sued for, assuming that no conspiracy between the warehouseman and the bailor is alleged?

7. If any one of questions Nos. 3, 4, 5, or 6 should be answered in the affirmative, would the action be maintainable, as against a general demurrer, if it further appear therein that the tender by the warehouseman of the identical articles for which the receipts were issued was by the assignee accepted, though under the protest and notice to the warehouseman, at the time, that the assignee in so accepting the identical articles "did not waive any right or claim it might have against the defendant by reason of any failure on the latter's part to comply with the terms of the said receipts it had issued," but where it does not appear in the petition whether or not the warehouseman agreed that such acceptance might be made without such waiver, and assuming the action to be one ex contractu?

8. If the action be construed as one ex delicto as for fraud and deceit, would the answer to question 7 be the same?

If any one of questions Nos. 3, 4, 5, or 6 should be answered in the affirmative, and if then also either question No. 7 or No. 8 should be answered in the affirmative, we desire instructions in answer to the following further questions:

9. Where by the language of a complaint it is uncertain and ambiguous whether the pleader intends to proceed upon an action ex contractu or upon an action ex delicto, and where the ambiguity or duplicity has not been removed or raised by demurrer, is it the duty of this court, in passing upon exceptions to the sustaining of a general demurrer to the petition, to decide whether the action be ex contractu or ex delicto, in the event we should hold that a cause of action is alleged in each form?

10. Where by the language of a petition it is uncertain whether the pleader intends to proceed upon an action ex contractu or upon an action ex delicto, and the ambiguity or uncertainty has not been removed or raised by a demurrer, and where the averments of the petition as a whole are generally more appropriate to an action ex delicto, and assuming that if that construction be given no cause of action is set forth; and assuming that if the other construction be given a cause of action is set forth, which construction should the court adopt in passing upon exceptions to the sustaining of a general demurrer to the petition, assuming further that under either form of the action the measure of damages would be the same?

11. If a complaint be construed as indicating an intention on the part of the pleader to proceed thereon as for fraud and deceit, but if in the original petition it is only alleged that the defendant "knew or by the most casual inspection and in the exercise of the slightest ordinary care could and should have known" a material fact (the actual knowledge of which by the defendant would be necessary to complete the cause of action), such alternative allegation appearing in several distinct paragraphs of the petition; and where an amendment charging actual knowledge by the defendant of such fact is offered and allowed to a *specific paragraph,* but there is no amendment striking or modifying such alternative allegations in the other paragraphs, should the amendment, in passing upon exceptions to the sustaining of a general demurrer to

the petition, be so construed as to apply to the whole suit, and thus to substitute a charge of actual knowledge for the alternative allegations wherever they occur in the other paragraphs of the suit; that is to say, should such an amendment be held to charge such actual knowledge of such fact for the purpose of the whole suit, or should the complaint, even after the amendment, be construed and considered as charging at last constructive knowledge only?

*Wright & Jackson* and *Adams & Adams,* for plaintiff.

*Alexander & Lee* and *Hamilton Phinizy,* for defendant.

HINES, J. 1. To make a usage and custom of trade binding, it must be known, certain, uniform, reasonable, and not contrary to law. *Berry* v. *Cooper,* 28 *Ga.* 543 (3); 17 C. J. 452, note 48. An alleged usage, which leaves some material element to the discretion of the individual is void for uncertainty. Such an usage would be void because useless. It would be like an automobile without gears. *Wallace* v. *Morgan,* 23 Ind. 399; *Minis* v. *Nelson,* 43 Fed. 777; *Oelricks* v. *Ford,* 64 U. S. 49, 62 (16 L. ed. 534). This is so for the reason that the office of a custom or usage is to interpret the otherwise indeterminate intentions of the parties. *The Reeside,* 2 Sumner, 567; *Mutual &c. Ins. Co.* v. *Ruse,* 8 *Ga.* 534, 541.

The rules of interpretation and construction applicable to pleadings are the same as those pertaining to other writings and documents. A petition should be construed according to the general scope and tenor of its averments; and where it is open to construction, it should be given such reasonable meaning as will support it rather than defeat it. *Town of Cameron* v. *Hicks,* 65 W. Va. 484 (64 S. E. 832, 17 Ann. Cas. 926); *Bennington Iron Co.* v. *Rutherford,* 18 N. J. L. 105 (35 Am. D. 528); *Bates* v. *Babcock,* 95 Cal. 479 (30 Pac. 605, 29 Am. St. R. 133, 16 L. R. A. 745); *Comegys* v. *Emerick,* 134 Ind. 148 (33 N. E. 899, 38 Am. St. R. 245); *Hart* v. *Neillsville,* 125 Wis. 546 (104 N. W. 699, 1 L. R. A. (N. S.) 952).

A custom in the cotton trade, that bales of cotton "or at least the great bulk of them, should average in weight 500 pounds," or "should average in the neighborhood of" or "around 500 pounds per bale," is not void for uncertainty. Such language requires bales of cotton to average 500 pounds, with provision for such slight variations as are necessarily incident to accident or to the

inherent difficulty of packing bales of cotton each with the exact weight of 500 pounds. The purpose is to provide against accidental variations arising from small and unimportant excesses or deficiencies in weight. This principle has been applied to contracts for the purchase of goods, and to other contracts in which such qualifying language is used. 35 Cyc. 206, 210D; Brawley *v.* United States, 96 U. S. 168 (24 L. ed. 622); *Horan* v. *Strachan,* 86 *Ga.* 408 (12 S. E. 678, 22 Am. St. R. 471); *Bass Dry Goods Co.* v. *Granite City &c. Co.,* 113 *Ga.* 1142 (4) (39 S. E. 471); *Terry* v. *International Cotton Co.,* 136 *Ga.* 187 (70 S. E. 1100); *Shore Lumber Co.* v. *American Lumber &c. Co.,* 23 *Ga. App.* 135 (97 S. E. 667); *Bennett* v. *Mann,* 24 *Ga. App.* 581 (101 S. E. 706); Thompson *v.* Strong, 74 So. 34 (1); Kirwan *v.* Van Camp Pkg. Co., 12 Ind. App. 1 (39 N. E. 536). We see no reason why the same rule should not apply in the construction of a usage as is applicable in the interpretation of a contract containing the same averments; and the petition set forth a certain, definite, and enforceable custom. So we answer the first question propounded by the Court of Appeals in the affirmative.

2. In answering the first question propounded by the Court of Appeals, we have reached the conclusion that the plaintiff's averments, pertaining to the custom fixing the weight of bales of cotton, fix such weight with sufficient definiteness to afford a sufficiently certain basis for computing the defendant's alleged liability, and it becomes unnecessary to determine whether these averments are superseded by other allegations in the petition which, in effect, allege that the articles by the custom should be of the definite weight stated. However, applying the rule for the construction of pleadings above announced, such former averments would not be superseded by such latter allegations. A pleading must be construed as a whole. We must look to its four corners for its proper interpretation. In view of our holding that the averments set out in the first question stated a sufficiently certain and definite custom, other allegations, which state the custom with sufficient definiteness as to the weight of the articles, clarify the meaning of the allegations embraced in the first question and strengthen our construction thereof. At most, lack of clearness, or duplicity, arising from these different allegations, if any, could only be reached by a special demurrer. *Central of Ga. Ry. Co.* v. *Banks,* 128 *Ga.* 785

(58 S. E. 352).   Such lack of clearness or taint of duplicity would not render the petition subject to a general demurrer. So we answer the first branch of the second question in the affirmative, and the last branch thereof in the negative.

3. If a warehouseman, for cotton stored with him for safe-keeping, issues to the owner negotiable warehouse receipts, in which the commodity is described only as so many bales, and neither the weight nor grade of the cotton is stated or indicated, but at the time there is a universal, definite, and valid custom and usage in the trade in the locality of the transaction, known to the warehouseman, that bales of cotton should be of a given grade and weight, and, if the bales of cotton for which such receipts are issued are far below such customary weight and grade; and if the owner for value received assign such receipts to one who takes the same relying upon such custom, and without any notice of the actual weight and grade of such bales of cotton, when the warehouseman at the time of issuing such receipts knew, or "by the most casual inspection and in the exercise of the slightest ordinary care could and should have known," of the actual weight and grade of the cotton, will the warehouseman, in an action brought against him by the assignee, alleging the above facts, be liable for the difference between the actual value of the identical cotton stored and the value of the same if of the customary weight and grade, where the warehouseman tendered to the assignee the identical bales of cotton for which the receipts were issued? The answer to this question depends upon the proper answers to two other questions. The first question is: Is a universal, definite and valid custom or usage, which defines and fixes the grade and weight of bales of cotton, to be read into and made a part of receipts given by a warehouseman for the storage of goods, in which the goods stored are described only as so many bales of cotton, without stating and indicating the grade or weight of the bales? The receipts being for bales of cotton, without stating their weight or grade, parol evidence would be admissible to prove the "peculiar meaning" of "bales of cotton" in the cotton trade or business, under section 4268 of the Civil Code, which declares that "the local usage or understanding of a word may be proved in order to arrive at the meaning intended by the parties." Certainly in contracts for the sale of cotton it is permissible to allege and prove that a bale of

cotton, according to the custom of the cotton trade, means a bale of a given weight and grade. *Stewart* v. *Cook,* 118 *Ga.* 541 (45 S. E. 398) ; *Watson* v. *Hazlehurst,* 127 *Ga.* 298, 300 (56 S. E. 459) ; *Hamby* v. *Truitt,* 14 *Ga. App.* 515, 518 (81 S. E. 593). We see no good reason why the same rule should not apply in the construction of contracts for the storage of cotton, where the rights of bona fide assignees of warehouse receipts for such goods are involved. The receipts describe the property stored as bales of cotton. The meaning of the words, "bales of cotton," may be arrived at by the local usage or understanding of their meaning in the cotton trade. This view is borne out by the authorities.

The usages of a particular business, which are known, uniform, reasonable, and not contrary to law or public policy, may be presumed to have entered into and formed a part of the contracts and undertakings of persons engaged in such business and those who deal with them. Morningstar v. Cunningham, 110 Ind. 328 (11 N. E. 593, 59 Am. R. 211) ; Lyon v. Lenon, 106 Ind. 567 (7 N. E. 311) ; Cooper v. Kane, 19 Wend. 386 (32 Am. D. 512) ; Withnell v. Gartham, 6 T. R. 388, 398; Rushforth v. Hadfield, 6 East, 508; Mooney v. Howard Ins. Co., 138 Mass. 375 (52 Am. R. 277) ; Inglebright v. Hammond, 19 Ohio, 337 (53 Am. D. 430) ; E. T., V. & G. R. Co. v. Johnston, 75 Ala. 596 (51 Am. R. 489). So warehousemen's receipts for goods stored may be construed by adopting the meaning of their terms as explained by commercial usage. Drudge v. Leiter, 18 Ind. App. 694 (49 N. E. 34, 63 Am. St. R. 359) ; Savage v. Salem Mills Co., 48 Ore. 1 (85 Pac. 69, 10 Ann. Cas. 1065) ; Ledyard v. Hibbard, 48 Mich. 421 (12 N. W. 637, 42 Am. R. 474).

"In the case of warehouse receipts the usual rule applies that, while usage cannot control an express contract, it is presumed, when a contract is ambiguous, that it was made with reference to a known usage or ordinary course of a particular business, and that such usage or course of business is, therefore, provable to raise a presumption that the transaction was in conformity therewith." 27 R. C. L. 965, § 20. "Warehouse receipts should be construed in accordance with the rules applicable to the construction of contracts in general, and especially in accordance with commercial usage." 40 Cyc. 412. Reading into the receipts the terms of the stated usage, they mean that the warehouseman had received the

given number of bales of the given weight and grade. This being so, the second question is, what is the liability of the warehouse-man, if the cotton falls below such weight and grade? Is he liable for the difference in value of the article in its actual condition and the value thereof if of the weight and grade defined and fixed by such custom?

The Supreme Court of Wisconsin held, that where a warehouse-man gave his receipt for 54 barrels of mess pork, the barrels being branded as containing "mess pork," when in fact they contained only salt, the obligation of the warehouseman to a bona fide assignee of such receipt, in the absence of fraud or negligence on its part, was discharged by delivering the property actually received in store, although it did not answer the description in the receipt. That court held that the words, "mess pork," were clearly words of description inserted for the purpose of identification, and did not signify that the barrels actually contained that article to the knowledge of the warehouseman, or amount to a representation by the warehouseman as to their contents. That court based its ruling further on the fact that a warehouseman is not authorized to open and inspect barrels or packages delivered to him for safe-keeping. Still that court was careful to make exception in cases of fraud or negligence on the part of the warehouseman. In Dean v. Driggs, 137 N. Y. 274 (33 N. E. 326, 19 L. R. A. 302, 33 Am. St. R. 721), the warehouseman issued his receipt purporting to be for a specified number of barrels of Portland cement. The barrels did not contain cement at all, but only a worthless substance. The barrels were those in which Portland cement was imported. Each barrel was branded as containing cement. The Court of Appeals of New York held that the language in the receipt was merely descriptive of the barrels which the warehouseman received, and did not amount to a representation that they in fact contained Portland cement. The court held that "representations in a bill of lading or warehouse receipt which should be held to be warranties should be confined usually to those which the carrier or ware-houseman may ordinarily be assumed to have knowledge of, or which he or his agents ought to know." In that case, under its facts, the court held that the warehouseman was not liable to a bona fide assignee of the warehouse receipts.

In Robson v. Swart, 14 Minn. 371 (100 Am. D. 238), the owner

delivered to the warehouseman at different times wheat aggregating 927 bushels, and took from the warehouseman a memorandum of each delivery, showing the quantity of the wheat received, in which the wheat was described as "No. 2 Wheat." The Supreme Court of Minnesota held that, in an action by the purchaser to whom the owner of the wheat had transferred such memoranda, the warehouseman was "not estopped from showing that the wheat delivered to him was not No. 2 wheat, nor from showing that he is entitled to discharge his contract by returning the same wheat that he received." In that case the court based its ruling upon the fact that these memoranda were "not analogous to bills of lading, or to regular and formal warehouse receipts." In the cases cited, with exception of the last case, the courts made exceptions in favor of bona fide assignees of warehouse receipts which were fraudulently or negligently issued, and in that case the decision seems to rest upon the fact that the memoranda were not "regular and formal warehouse receipts." In none of the cases cited, or those of similar import, were the courts dealing with the effect of a custom, or commercial usage, which defined the meaning of words. Furthermore, in the cases cited, excepting the last case, the quality of the goods stored was not visible or open to inspection. We think the warehouseman is estopped from denying the description of the property in his receipt so far as it relates to matters which are, or ought to be, within his knowledge. Inasmuch as warehousemen's receipts are now generally made negotiable by statute, it should be held that he is estopped by the descriptions in his receipt, as far as they relate to matters within his knowledge, or which it is his duty to know. On the contrary, it would be too strict and severe a rule against a warehouseman to hold that he is estopped by the description in the receipts as to matters which are necessarily hidden from him, and which he is under no legal obligation to know. In the question propounded by the Court of Appeals, with which we are dealing, the warehouseman, "by the most casual inspection, and in the exercise of the slightest ordinary care, could and should have known" of the weight and grade of this cotton. So it cannot be said that these matters were not open and visible to him. He should have known of them under the conditions stated.

Under our law warehouse receipts may be pledged. Civil Code

(1910), § 3528. A cotton warehouse receipt may be both a symbol and a security. "If warehouse receipts of a special form and character be adopted and issued in due course of business for the express purpose of being pledged as security to obtain money," and if under a commercial usage the warehouseman knows that the language of his receipt means that the articles stored are of a given weight, grade, and ·quality, "the pledgee of such receipts, after advancing his money in good faith, is entitled to stand on the terms of the pledged receipt as importing a genuine business transaction of the nature described in the instrument." *Planters' Rice-Mill Co.* v. *Merchants' Nat. Bk.,* 78 *Ga.* 574 (3 S. E. 327). In the case last cited this court held that the warehouseman would be estopped, as against a bona fide transferee, from denying that he received the goods for which his warehouse receipts were given, although such receipts were fraudulently issued by his agent because no goods in fact had been received for storage, the agent being clothed with power to issue such receipts. This principle is now generally recognized. Further, "if the warehouseman gives to the party who holds such receipt a false credit, he will not be suffered to contradict the statement which he has made in the receipt, so as to injure a party who has been misled by it." McNeil v. Hill, 1 Woolworth's Circuit Ct. R. 96; *American Nat. Bk.* v. *Georgia R. Co.,* 96 *Ga.* 665 (23 S. E. 898, 51 Am. St. R. 155).

So we are of the opinion that where a warehouseman issued his receipts for cotton stored, in which the cotton was described only as so many bales, without stating their weight or grade, and there is in the cotton trade a custom or commercial usage which defines and fixes the meaning of the words, "bales of cotton," as being of a given weight and grade, such receipts contained, under such custom or usage, a representation that such bales of cotton were of a given weight and grade. The issuing of such receipts gives to the holder a false credit, if they do not come up to such weight or grade; and the warehouseman will be estopped to deny. that the bales are not of such weight and grade. So we answer the third question of the Court of Appeals in the affirmative.

4. Having answered the third question in the affirmative, we make no answer to the fourth question, as the Court of Appeals does not wish an answer to the latter question unless we answered the former in the negative.

5. We come now to consider the fifth question of the Court of Appeals. Under the facts stated in this question, the warehouseman would not be estopped, in an action brought against him by the assignee to recover the difference between the actual value of such articles and the value they would have had if conforming to the weight and grade the assignee expected, from claiming that the identical articles were not of the weight and grade which the assignee expected and believed. The receipts did not state the weight and grade of the cotton. These documents made no representations as to these matters. Custom or usage, under this question, cannot be looked to to determine whether any language in the receipts amounts to a statement or representation as to the weight or grade of the bales of cotton stored. It is not alleged in the question that the warehouseman did or said anything to the assignee to engender in his mind the expectation that the articles would be of a certain weight and grade. It is not stated in the question that the silence of the warehouseman, when it was his duty to speak, created such expectation on the part of the assignee. Reduced to its last analysis the question is this: Does the mere knowledge of a warehouseman, at the time of the issuance of his receipts for goods stored, which do not state the quantity and quality of the goods, that an assignee of such receipts would expect and believe that the articles mentioned therein would be of a certain weight and grade, and if the assignee takes assignments of the receipts for value in such expectation and belief, estop him from saying and claiming that the identical articles stored were not of the weight and grade which the assignee expected and believed the articles would have at the time of taking assignments of such receipts? We think not. It is sought to apply the principle that "a meaning placed on the contract by one party, and known to be thus understood by the other party, at the time, should be held as the true meaning" when "the intention of the parties may differ among themselves." Civil Code (1910), § 4267. This principle applies to the immediate parties to the contract. Two contracts are here involved,—the contract between the bailor and the warehouseman, which was evidenced by the latter's receipts, and the contract between the bailor and his assignee, which is evidenced by the assignment of the former contract by the bailor to his assignee. The warehouseman, by his contract, obligates himself to

deliver to the bailor the identical goods stored with him by the bailor.  If the warehouseman and bailor of this cotton should differ as to their intention in entering into the contract, then the meaning placed upon it by one of them, and known to be thus understood by the other at the time, would be held to be the true meaning of the contract.  This doctrine will not be extended beyond the immediate parties to a contract.  The warehouseman was not a party to the contract of assignment.  The meaning put upon this contract by the assignee, if known to the assignor, should be held to be its true meaning, when they differed as to its meaning; but the meaning of the contract of storage would not be determined by the meaning put upon it by a third party.  Certainly a warehouseman would not be bound to deliver to an assignee of his receipts any other goods than those actually stored with him, from his mere knowledge, at the time he issued the receipts, that others might take assignments thereof under the expectation and belief that the goods received by the warehouseman would be of a certain quantity and quality, when the warehouseman did nothing to induce the assignee of his receipts to form such expectation and belief.

It is next insisted that the warehouseman, when he issued these receipts, put it into the power of the bailor to injure third persons, and that, when one of two innocent persons must suffer, the person who put it into the power of such third person to inflict injury must bear the brunt.  Civil Code (1910), § 4537.  This equitable principle is not applicable under the facts set out in this question.  There is nothing in the receipts which represents or indicates that the warehouseman is to deliver any goods other than those actually received and stored by him.  The warehouseman did not put it into the power of the bailor to enlarge his obligation arising from his contract.  The only thing which he put into the power of the bailor to do was to assign these receipts and to confer upon his assignee his rights, and to subject the warehouseman to his obligation under the contract of bailment.

Nor is the doctrine of estoppel by conduct or silence applicable under the facts stated in this question.  "To constitute an estoppel by conduct, there must be (1) a false representation or concealment of fact; (2) it must be within the knowledge of the party making the one or concealing the other; (3) the person affected thereby must be ignorant of the truth; (4) the person seeking to

influence the conduct of the other must act intentionally for that purpose; (5) the person complaining must have been induced to act by reason of such conduct of the other; and (6) he must in fact act upon it in such manner as to change his position for the worse." *Kennedy* v. *Manry,* 6 *Ga. App.* 816 (66 S. E. 29); 21 C. J. 1119, § 122. Estoppel by silence only arises where a person, who is by force of circumstances under a duty to speak, refrains from speaking out, and thereby leads another to believe in the existence of facts upon which he acts to his hurt. The circumstances must not only afford an opportunity to speak, but also create a duty to speak. Civil Code (1910), § 4419; *Cuthbert Ice Co.* v. *York Mfg. Co.,* 20 *Ga. App.* 695, 700 (93 S. E. 279); 21 C. J. 1150, § 154. The estoppel must arise in the transaction in which the complaining party acquired rights, and must be the proximate cause of leading him into loss. 21 C. J. 1169, § 175.

So we are of the opinion that the mere knowledge of a warehouseman, at the time he issues his receipts for goods stored, that an assignee of such receipts would accept them in the expectation and belief that the goods were of a given weight and grade, will not estop "the warehouseman from saying and claiming that the identical articles were not of the weight and grade which the assignee expected and believed the articles would have," there being no collusion or conspiracy between bailor and warehouseman, and the warehouseman not having caused the assignee to entertain such expectation and belief by his conduct or silence, at the time of the assignment, and the receipts not representing, nor indicating, the weight and grade of the articles which the assignee expected.

6. The answer to the fifth question would not be different under the facts stated in the sixth question, and for the reasons given in answering the former question.

7. Having answered the third question in the affirmative, it becomes necessary to answer the seventh question. Was the petition good against a general demurrer, it appearing that the tender by the warehouseman of the identical articles for which the receipts were issued was by the assignee accepted under protest and notice to the warehouseman, at the time, that the assignee, in accepting the identical articles, "did not waive any right or claim it might have against the defendant [the warehouseman] by reason of any failure on the latter's part to comply with the terms of said re-

ceipts it had issued," it not appearing in the petition whether or not the warehouseman agreed that such acceptance might be made without such waiver, and assuming the action to be one ex contractu? Where a debtor concedes his liability for part of an account which is in dispute, and tenders the sum which he admits to be due in payment, on the condition that it should be in full settlement of the account, the creditor, by accepting and using the amount so tendered, extinguishes the whole account, notwithstanding the fact that he protests at the time that the remainder of the account is still due and owing. *Hamilton* v. *Stewart*, 105 *Ga.* 300 (31 S. E. 184), s. c. 108 *Ga.* 472 (34 S. E. 123) ; *Jenkins* v. *Nat. Mut. B. & L. Asso.*, 111 *Ga.* 732 (36 S. E. 945) ; *Walker* v. *O'Neill Mfg. Co.*, 128 *Ga.* 831 (2) (58 S. E. 475) ; *Redmond* v. *A. & B. Air-Line Ry.*, 129 *Ga.* 133 (58 S. E. 874) ; *Bass Dry Goods Co.* v. *Roberts Coal Co.*, 4 *Ga. App.* 520 (61 S. E. 1134) ; *Riley* v. *London Guaranty &c. Co.*, 27 *Ga. App.* 686(1e) (109 S. E. 676). The reason of this rule is that payment being made upon condition, the acceptance of the payment carries with it the acceptance of the condition.

We see no reason why the same rule should not apply where there is a bona fide dispute between a warehouseman and an assignee of his receipts, given for goods stored, as to the quantity and quality of such goods, the warehouseman contending that he was only liable for the delivery of the actual articles stored with him by the bailor, and the assignee of the receipts claiming that the receipts call for goods of greater quantity and higher quality than those actually received by the warehouseman, and where the warehouseman tenders the goods actually received by him in full satisfaction of his liability and the assignee accepts the goods tendered upon the condition of the tender, although he accepts such goods under protest. Counsel for the plaintiff contends that "The tender must be of goods of the proper quantity and quality;" and that "A tender of goods not conforming to the requirements of the contract as to quality is not a sufficient tender." 35 Cyc. 170, c. The question for decision is not whether the tender was a good one, but what is the effect of the acceptance of an improper tender. The question for our decision is not whether acceptance of goods which do not come up to the quantity and quality of those bought amounts to a waiver of damages for deficiency in either respect.

That was the question involved in *Van Winkle* v. *Wilkins,* 81 *Ga.* 93 (7 S. E. 644, 12 Am. St. R. 299), and *Poland Paper Co.* v. *Foote & Davies Co.,* 118 *Ga.* 458 (45 S. E. 374). The point raised in this question is, what is the effect of the tender of the goods actually received by the warehouseman and their acceptance by the assignee of the receipts given by the warehouseman therefor? · The acceptance by the assignee of the goods tendered upon condition that their acceptance shall be in full settlement of the liability extinguishes such liability; and thereafter the assignee cannot maintain his action for the recovery of goods of the quantity and quality for which the warehouseman would be liable under his receipts. While this is so, when the warehouseman tenders goods actually received by him, and the assignee receives them upon condition that he does not receive them in full satisfaction and settlement of the liability of the warehouseman, such acceptance of the articles would not extinguish the liability of the warehouseman to the assignee. As there may be a tender upon condition that acceptance shall extinguish the claim of the creditor, so there may be an acceptance on condition that it would not extinguish the liability of the debtor. The facts stated in this question, construing the pleadings most strongly against the pleader, do not make a case where the goods actually received were tendered in full satisfaction of the liability of the warehouseman; but make a case where the goods were accepted by the assignee upon the condition that he did not waive any of his rights against the warehouseman by such acceptance. This being so, the petition was not subject to a general demurrer, on the ground that the facts therein stated show an accord and satisfaction between the parties. We answer question No. 7 in the affirmative.

8. If the action be construed to be one ex delicto, the answer to question No. 8 would be the same as the answer which we have made to question No. 7.

9. The test of the sufficiency of a petition, as against a general demurrer, is whether the defendant can admit all that is alleged and escape liability. *Pullman Car Co.* v. *Martin,* 92 *Ga.* 161 (18 S. E. 364) ; *Ga. R. & B. Co.* v. *Rayford,* 115 *Ga.* 937 (42 S. E. 234). So if the petition sets forth a cause of action either ex contractu or ex delicto, it would withstand a general demurrer, and it would not be the duty of the appellate court, in passing upon

exceptions to a judgment sustaining a general demurrer, to decide whether the action is one ex contractu or ex delicto. .

10. Where from the language of a petition it is doubtful whether the pleader intends to proceed upon the action as one ex contractu or as one ex delicto, the ambiguity not being raised by demurrer and thus removed, and where the averments of the petition as a whole are generally more appropriate to an action ex delicto, and where, if the petition is construed to be one arising in tort, no cause of action is set forth, and where, if the petition is construed to be one on contract, a cause of action is set forth, the court should, in passing upon an exception to a judgment sustaining a general demurrer to the petition, adopt the latter construction, as that construction will uphold the action. If a party has two remedies, one an action for breach of the contract, and the other an action on the case for the wrong, he may elect which of the remedies he will pursue. *Patterson* v. *Augusta &c. Railroad Co.*, 94 *Ga.* 140 (21 S. E. 283). In *Aiken* v. *Southern Railway Co.*, 118 *Ga.* 118 (44 S. E. 828, 62 L. R. A. 666, 98 Am. St. R. 107), it was said that a petition against a carrier for the breach of the ordinary contract of carriage of a passenger will be construed to be one for the redress of the tort, as "tort is the natural and habitual foundation of the action for the breach of such contract." In *Central Railway Co.* v. *Chicago Portrait Co.*, 122 *Ga.* 11 (49 S. E. 727, 106 Am. St. R. 87), the same principle was announced. These cases are not exactly in point, and do not solve and answer the question put to us by the Court of Appeals. This question is, if when one construction is put upon a petition it sets forth a cause of action, and if when another construction is put upon it it will set forth no cause of action, which construction must a reviewing court adopt, in deciding an exception to a judgment sustaining a general demurrer to the declaration? In *Central R. Co.* v. *Pickett*, 87 *Ga.* 734 (13 S. E. 750), this court ruled that where a declaration against a common carrier is susceptible of being construed equally as an action upon contract or an action of tort arising from the violation of a public duty by the carrier, and the same is not demurred to, the plaintiff at the trial may, at his option, elect to treat it as either one of these actions. If it is doubtful whether the suit is for a tort or one on contract, such ambiguity furnishes a ground for demurrer duly filed, when the

plaintiff may amend so as to clearly show whether he is suing for a tort or for breach of contract. *King* v. *Southern Ry. Co.,* 128 *Ga.* 285, 288 (57 S. E. 507) ; *Jenkins* v. *Seaboard Air-Line Ry.,* 3 *Ga. App.* 381 (59 S. E. 1120). The demurrer here referred to is a special demurrer, as that, and not a general demurrer, is the remedy for want of certainty and definiteness in a petition. *Johnson* v. *Edwards,* 147 *Ga.* 438 (94 S. E. 554) ; *Waldrup* v. *Central of Ga. Ry. Co.,* 127 *Ga.* 359 (56 S. E. 439) ; *Harris* v. *Wilcox,* 7 *Ga. App.* 121 (66 S. E. 380). No special demurrer having been filed by the defendant on the ground of duplicity in the petition, the plaintiff can elect upon which cause of action he will rely, if his petition sets out a cause of action which is good either as one for a tort or one for a breach of contract. In such a case the defendant can compel the plaintiff, by a special demurrer, to elect upon which theory he will proceed. Certainly as a general rule, a general demurrer to a petition should not be sustained on the ground of duplicity. It is likewise true that a reviewing court, in dealing with an exception to a judgment sustaining a general demurrer to a petition, should adopt that construction which will sustain the petition, and reject that construction which will defeat it. *Southern Express Co.* v. *Pope,* 5 *Ga. App.* 689, 697 (63 S. E. 809). The above, we hope, sufficiently answers the tenth question.

11. Where a complaint for fraud and deceit alleges, in several paragraphs, that the defendant "knew, or by the most casual inspection and in the exercise of the slightest ordinary care could and should have known" a material fact, and where an amendment to a specific paragraph, charging actual knowledge by the defendant of such fact, is allowed, but there is no amendment striking or changing such alternative allegations in the other paragraphs, the appellate court, in passing upon an exception to a judgment sustaining a general demurrer to the petition, should construe the amendment as applicable to the whole suit, and as charging actual knowledge of such fact. The better practice would be to amend and change the alternative allegation in each paragraph by striking such statement, and inserting in lieu thereof an allegation of actual knowledge of the fact alleged. The petition, thus amended, might be subject to a special demurrer on the

ground that the several paragraphs contained uncertain statements, but it would not be subject to a general demurrer.

*All the Justices concur, except Gilbert, J., disqualified.*