J. Wilton GRAVES, Appellant,

v.

Harry L. GARVIN, as Agent, Appellee.

No. 7973.

United States Court of Appeals Fourth Circuit.

Argued Nov. 5, 1959.

Decided Dec. 8, 1959.

W. Brantley Harvey, Beaufort, S. C. (Harvey & Harvey, Beaufort, S. C., on brief), for appellant.

Shelby Myrick, Jr., Savannah, Ga. and Norman W. Stevenson, Charleston, S. C. (Myrick, Myrick & Richardson, Savannah, Ga., and Barnwell, Whaley & Stevenson, Charleston, S. C., on brief), for appellee.

Before SOBELOFF, Chief Judge, and SOPER and BOREMAN, Circuit Judges.

BOREMAN, Circuit Judge.

This is an appeal from the order of the United States District Court for the Eastern District of South Carolina, Charleston Division, approving and confirming the report of the Standing Master, adopting such report as the court's findings of fact and conclusions of law and rendering judgment in favor of appellee. Involved is the foreclosure of two mortgages made, executed and delivered by the appellant, hereinafter referred to as Graves, a resident of Beaufort County, South Carolina, to The Savannah Bank & Trust Company of Savannah, Georgia, hereinafter referred to as Bank. The mortgages were assigned by the Bank to appellee, hereinafter referred to as Garvin.

Graves is a farmer who, during the years from 1948 to 1953, was engaged in raising turkeys for the fresh and frozen market. As turkeys were prepared, they were placed in storage with Garvin's Quick Frozen Products Company in Savannah, Georgia, an employee of that company issuing a receipt to Graves showing the quantity of each delivery. These receipt forms were contained in books, five to each sheet or page, and were designed for execution in triplicate. Up until October of 1952, each customer, including Graves, was given the original and one carbon copy of the receipt, the third copy being retained by the storage company. These receipts were referred to as representing "ins". As Graves' turkeys were released, the customer receipted therefor, the amount of each delivery was recorded in a bound book and these deliveries were referred to as "outs". Admitted in evidence were three of these bound books, referred to as "day books", all of which pertained solely to the account of Graves, and it was testified that the various items showing "ins" and "outs" were posted in the day books by the bookkeeper from the copies of receipts given to Graves and from customers' receipts for "out" deliveries. In October 1952, the use of these receipt books was discontinued and some type of machine or register receipt was substituted. Thereafter, Graves received only one copy of a receipt for each "in" delivery. Periodically Graves visited the storage company and, after being shown the customers' receipts, signed or initialed the day book showing the "out" deliveries.

In order to finance his operation, Graves borrowed money from the Bank and gave as security for the loans mortgages on his home and also pledged to the Bank, as collateral security, the turkeys stored in Garvin's Quick Frozen Products Company, for whose benefit this action is brought by its agent. Graves procured from the Garvin Company inventory statements or receipts which purported to show the number of pounds of turkey in storage and these statements were furnished to the Bank. On at least one or two occasions, these statements were addressed by the Garvin Company direct-

ly to the Bank rather than to Graves. An officer of the Bank recorded on the face of the renewal notes the number of pounds of turkey in storage as shown by the inventory statements. The first of such statements was dated January 1, 1951, statements thereafter being furnished as required for the renewal of notes up until July 1953, the date of the last such statement.

Customers of Graves were authorized to obtain turkeys from storage and a record of deliveries to customers was kept by the storage company. In August 1953, Graves learned that delivery to a customer had been refused because the Garvin Company claimed that Graves had no turkeys remaining in storage. Graves disputed this fact, reported it to the Bank and requested the Bank to bring suit against Garvin Company on the inventory receipt or statement. Graves' claim was based primarily upon a statement dated January 21, 1952, indicating 38,000 pounds of turkey then in storage, signed by Mrs. Youmans, an employee of the Garvin Company. Graves contends that, after taking into account the turkeys removed by customers, he should have had 23,865½ pounds of turkey in storage as of August 1953. The Garvin Company disputed the correctness of the January 21, 1952, inventory statement, alleging that it was an error made by Mrs. Youmans in accepting Graves' representation as to the number of pounds of turkey in storage, that Graves knew and subsequently acknowledged the error, and that the error had been carried forward in later statements furnished to Graves and to the Bank.

The Bank refused to bring suit against Garvin Company and, on August 26, 1953, Graves filed a trover suit in the City Court of Savannah, Georgia, to recover the turkeys, or the value thereof, that he had, or should have had, in storage. While this action was pending, the Bank sued Graves on his notes and "filed garnishment" against any indebtedness of the Garvin Company to Graves. While both of these actions were pending, Garvin Company paid to the Bank the amount admittedly due from Graves to the Bank and took from the Bank an assignment of Graves' notes and mortgages. Graves then dismissed his suit against Garvin Company upon advice of his counsel that such act constituted an extinguishment of Graves' debt to the Bank. Since a counterclaim had been filed by the Garvin Company for storage charges, Graves paid the amount of the counterclaim, as reduced by agreement, and the action was dismissed. The present action was then filed by Garvin, as agent, to foreclose the Graves' mortgages. Graves filed his answer, asserting extinguishment of the debt, or, in the alternative, a counterclaim or right of setoff in the amount of the value of the turkeys he had, or should have had, in storage.

The case was referred by the District Court to a Standing Master who took testimony and reported the following findings of fact and conclusions of law relevant to this appeal:

1. That there was a valid assignment, for valuable consideration, from Bank to Garvin and that the amount owing by Graves to Bank was owed to Garvin, less any amount which Graves could establish as due from Garvin to him for frozen turkeys not accounted for;

2. That the burden of proving the setoff or counterclaim was upon Graves and that he failed to sustain this burden of proof;

3. That the testimony of an accountant, one Carson, as to his examination of the books and records of the Garvin's Company pertaining to the Graves' account, and a report of the audit made by him were entitled to great weight and that the audit, as checked and corrected by the Master, is a correct statement of the account;

4. That Garvin should have in storage 596 pounds of turkey belonging to Graves and that the value thereof, at 53¢ per pound, is $305.88;

5. That the $305.88, with interest at 7% per annum from July 21, 1953, should be set off and deducted from the indebtedness of Graves to Garvin;

6. That the principal amount due and owing from Graves to Garvin on the notes and mortgages, plus interest and a reasonable attorney's fee, shall constitute a first lien upon the premises covered by the mortgages.

Graves relies primarily upon an alleged error in the admission of certain evidence tending to challenge the correctness of the inventory statement of January 21, 1952, showing the number of pounds of turkey in storage, contending that the evidence, unsupported by books of original entry of the Garvin Company, was inadmissible. More particularly, Graves complains that the day books were not the best evidence and that the report of audit by the accountant, Carson, was improperly admitted as an exhibit because the receipt books were books of original entry and were not offered in evidence. Graves further argues that the inventory statement given to him by Mrs. Youmans on January 21, 1952, is a Warehouse Receipt and, as such, is a written contract the terms of which cannot be varied by parol evidence. Therefore, he contends that the Master improperly admitted the testimony of the witnesses, Mrs. Seig, Mrs. Youmans, Mrs. Stalvey and Mr. Tillman, to show that he, Graves, had acknowledged the falsity of the inventory receipt of January 21, 1952.

Mrs. Seig, the regular bookkeeper, testified that she examined all of the receipts showing both "ins" and "outs", compared them with the entries in the day books and made up an account. Subsequently, Carson, the accountant, was employed to audit the Graves' account and he went through the receipt books, removing therefrom the copy of each receipt furnished to Graves. It was testified that Mrs. Seig assisted Carson. These receipts were admitted in evidence although not all of the books from which they had been removed were produced pursuant to counsel's demand.

■ We find no merit in Graves' contentions. As is stated in annotation 1951, 17 A.L.R.2d 235, 246,

"* * * In other words, a book of account made up in the usual course of business from slips, reports, or memoranda furnished by the employees who conducted the transactions, which constitutes the first permanent record of the transactions entered in it, is a book of original entry and admissible in evidence as such."

This principle is supported by Metropolitan Casualty Ins. Co. v. Smith, 9 Cir., 1932, 58 F.2d 699, 701, wherein it is stated that if the books are kept in the ordinary course of business, they are competent evidence. The court said:

"The fact that slips or memoranda were made out by persons delivering and receiving the material, and that such slips were used by the bookkeeper in making the original entries in the books, did not * * * take away the character of the books as books of original entry."

Additional support is found for this principle in Somberg v. United States, 7 Cir., 1934, 71 F.2d 637, 640, where the court held:

"* * * In laying a proper foundation for the admission of a record of original entry, it is not necessary to prove that such record contains the first memorandum or entry of a transaction. It is sufficient if it contains the first permanent entry of the transaction. Osborne v. United States, 9 Cir., 17 F.2d 246."

See, in accord, The Spica, 2 Cir., 1923, 289 F. 436; Chicago Lumbering Co. v. Hewitt, 6 Cir., 1894, 64 F. 314; Seaboard Air Line Ry. v. Earle, 1910, 86 S.C. 91, 93, 67 S.E. 1069, 1070; Currie v. Davis, 1923, 130 S.C. 408, 126 S.E. 119; United Grocery Co. v. J. M. Dannelly & Son, 1913, 93 S.C. 580, 77 S.E. 706, and additional case references in 20 Am.Jur. Evidence § 1066 (1939).

■■ It is our opinion that the books of account, referred to as the day books, all of which were introduced in evidence for the period in question, are books of original entry. The purpose of the receipts, which were made in triplicate,

was to provide the customer with two copies and to leave one copy from which the entries in the bound books of account were made. The evidence indicates that even though Mrs. Seig generally prepared the receipts for deliveries in and out, other employees made up such receipts in her absence. This procedure indicates a policy of the company to treat the copies of receipts and the customers' "out" receipts as temporary memoranda from which the permanent records, in the form of books of account, were made up. As stated in Somberg v. United States, supra, it is not necessary that the record contain the first memorandum or entry of a transaction so long as it contains the first permanent entry of the transaction.

■ The books of original entry were audited by the accountant, Carson, after examination of all available receipts, and the report of his audit is nothing more than a summarization of the information contained in the storage company's records. However, the Master did not rely upon the accountant's report of audit but undertook to verify it by making his own examination of all of the receipts and the books of account. He found only minor mathematical errors and made appropriate corrections. The evidence was abundantly sufficient to support the Master's statement of the account between Garvin and Graves.

■■ The Master held, and the court found, that Graves failed to sustain the burden imposed upon him to prove his right of setoff or counterclaim. Graves offered no documentary evidence of his transactions with Garvin except the inventory receipts, upon which he chose to rest his case. He kept no books. He produced no receipts showing his deliveries of turkeys for storage, explaining that they were lost or destroyed. Mrs. Youmans, the employee who prepared the inventory statement of January 21, 1952, testified that she told Graves that she could not take a complete inventory, that she did not have accurate information and that she relied upon Graves' assurances that the information contained in the inventory receipt was correct. The testimony of four witnesses was introduced to show that on two occasions Graves came to the storage plant and, in conversation with Mrs. Seig, acknowledged that the inventory receipt was inaccurate, promised to bring turkeys in to make up the deficit and stated that if the Bank learned of the error, he would probably go to jail. While Graves denied these alleged occurrences, there was sufficient evidence to support the Master's findings and we cannot say that the findings are clearly erroneous.

■■ If the inventory receipts were, in reality, Warehouse Receipts as contended by Graves, we would concede that they should be construed as contracts and that parol evidence would be inadmissible to vary their terms. Citizens' & Southern Bank v. Union Warehouse & Compress Co., 1924, 157 Ga. 434, 122 S.E. 327. However, we conclude that these receipts were not Warehouse Receipts within the purview of the Georgia Warehouse Act, the relevant portion of which Act is found in Ga.Code Ann. Title 111 (1955 Supp.). Section 111–502(a) of that title specifically excludes "refrigerated buildings" from coverage. Section 111–513 sets out the form of the receipt and states that although it need not be in any particular form, it *must* embody within its written or printed terms some ten requirements. The inventory receipts failed to meet certain of these requirements in the following particulars: (1) They did not contain a statement that the goods would be delivered to the bearer, to a specific person, or to a specified person or his order; (2) they did not state the rate of storage charges; (3) they did not show the amount of insurance or were not appropriately stamped if no insurance is required by reason of an agreement with the warehouse depositor. In addition, Section 111–516 specifically provides that no warehouseman shall deliver any agricultural product for which a receipt has been issued unless such receipt is surrendered to him, or unless the receipt is lost, in which case Section 111–514 is applied.

**930**

The evidence clearly indicates that at no time was a receipt required to be surrendered before turkeys were taken from storage. Rather, the turkeys were withdrawn from storage by certain of Graves' authorized customers and Graves would later sign or initial the book containing a record of the "outs". The inventory receipts furnished to Graves and to the Bank did not meet the requirements of the Georgia Warehouse Act.

We have considered other matters to which attention has been directed, but we are of the opinion that they do not merit discussion. The judgment of the District Court will be affirmed.

Affirmed.